CITY OF SALEM, Appellant,

v.

KONCELIK, Dir., Appellee.

[Cite as *Salem v. Koncelik,* 164 Ohio App.3d 597, 2005-Ohio-5537.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 05AP–50.

Decided Oct. 20, 2005.

598

Squire, Sanders & Dempsey, L.L.P., David W. Burchmore, and Kendra Sherman, for appellant.

Jim Petro, Attorney General, Kristina L. Erlewine, and Thomas P. Behlen, Assistant Attorneys General, for appellee.

---

BROWN, Presiding Judge.

{¶ 1} The city of Salem, appellant, appeals from an order of the Environmental Review Appeals Commission ("ERAC"), in which the ERAC affirmed the action of Joseph P. Koncelik, Director of Environmental Protection ("Director"), appellee, in issuing to Salem a National Pollutant Discharge Elimination System ("NPDES") renewal permit with certain restrictions.

{¶ 2} Salem owns and operates a municipal wastewater-treatment plant ("WWTP") that, pursuant to a permit issued by the Ohio Environmental Protection Agency ("OEPA"), discharges effluent into the Middle Fork of Little Beaver Creek ("Middle Fork") at approximately River Mile ("RM") 38.2. In 1999, the OEPA conducted a routine stream survey, during which it performed biological and chemical sampling of the Middle Fork. As a result of the sampling, the OEPA discovered that the concentrations of phosphorus immediately downstream from the WWTP increased dramatically. The OEPA found that at RM 38.3, which is immediately upstream from the WWTP, phosphorus was measured at 0.19, 0.08, and 0.1 milligrams per liter ("mg/l"). The OEPA also found that at RM 37.8, the first sampling location downstream from the WWTP, phosphorus was measured at concentrations from 8.6 to 17.0 mg/l. Phosphorus concentrations decreased as the river flowed downstream from the WWTP toward the mouth of Middle Fork. Further, the OEPA found that downstream from the WWTP, there existed considerable amounts of sewage solids, while similar solids were not seen in Middle Fork upstream of the WWTP.

{¶ 3} In addition, the OEPA evaluated the Middle Fork to determine whether the stream was attaining its designated uses, using two biological indices: the Index of Biotic Integrity ("IBI") and the Modified Index of Well Being ("MIWB"). The 1999 stream survey indicated that the IBI and MIWB scores reflect that the Middle Fork was not meeting the biological criteria at numerous locations downstream from the WWTP. Further, lesions and fin erosions, which are associated with excessive nutrients, were also observed on fish in the Middle Fork.

{¶ 4} In February 2002, the OEPA issued a draft renewal permit to Salem. The draft renewal permit proposed 1.0 mg/l weekly and 1.5 mg/l monthly concentration limits along with loading limits for total phosphorus. With regard

to suspended solids, the draft renewal permit proposed a total suspended solids ("TSS") limit on the Salem WWTP discharge that was more stringent than the one previously in place. The draft permit also proposed adding an effluent limit on conductivity and a monitoring requirement for total dissolved solids ("TDS").

{¶ 5} On May 15, 2002, the parties met to discuss the draft permit, at which time Salem indicated that to install a tertiary filtration system to meet the proposed TSS limits would cost approximately $3.5 million and the cost to meet the proposed phosphorus limits would be approximately $1.3 million, with annual operating and maintenance costs of $185,000. The OEPA believed that a compromise had been reached in which it would agree not to impose the more stringent TSS limits if Salem agreed to the proposed phosphorus limits. The OEPA entered the agreement believing that the proposed phosphorus-treatment system would also resolve issues involving the TSS.

{¶ 6} On May 31, 2002, the OEPA, under the direction of the Director, issued a final renewal permit to Salem, which imposed the proposed limits on the amount of phosphorus that the WWTP could discharge into the Middle Fork. The final permit also contained TDS conductivity limits. However, the final permit did not impose the more stringent TSS limits proposed in the draft permit.

{¶ 7} On June 28, 2002, Salem appealed the renewal permit issued by the ERAC, but only with regard to the new limits imposed for phosphorus. On February 2 through February 4, 2004, a de novo hearing was held by the ERAC. On December 16, 2004, the ERAC issued its findings of fact, conclusions of law, and final order. In its order, the ERAC concluded that it did not consider the application and interpretation of Ohio Adm.Code 3745(A)(6)(b) because it was finding that the OEPA's action comported with the legal authority granted to it by R.C. 6111.03(J)(3). The ERAC found that because the biological water quality standards were not being met in the Middle Fork, the OEPA was legally required by R.C. 6111.03(J)(3) to impose limits that are necessary and appropriate to achieve and maintain the applicable standards of water quality. Further, the ERAC found that the specific numeric limits imposed in Salem's permit were necessary and appropriate because other WWTPs were meeting similar limits, and the technology required to comply with those limits was achievable by well-known treatment processes. Salem has appealed the ERAC's order to this court, asserting the following assignments of error:

I. The Commission's ruling that ORC § 6111.03(J)(3) provides sufficient legal authority for the imposition of the phosphorus limits in Salem's permit, without reference to the factors specified in Ohio's biological criteria regulation at OAC § 3745–1–07(A)(6)(b), is not in accordance with law.

II. The Commission's failure to find that the Director's action was precluded by the limitations set forth in OAC § 3745–1–07(A)(6)(b) was not supported

by reliable, probative and substantial evidence and is not in accordance with law.

III. The Commission's finding that the specific numeric limits for phosphorus of 1.0 mg/l (weekly) and 1.5 mg/l (monthly) included in Salem's NPDES permit were "necessary and appropriate" to achieve applicable water quality standards is not supported by reliable, probative and substantial evidence and is not in accordance with law.

{¶ 8} Salem argues in its first assignment of error that the ERAC's ruling that R.C. 6111.03(J)(3) provides sufficient legal authority for imposing the phosphorus limits in Salem's permit, without reference to the factors specified in Ohio's biological criteria regulation at Ohio Adm.Code 3745–1–07(A)(6)(b), is not in accordance with law. This court is charged with determining whether the ERAC's order as to the lawfulness and reasonableness of the Director's action is supported by reliable, probative, and substantial evidence and is in accordance with law. *Red Hill Farm Trust v. Schregardus* (1995), 102 Ohio App.3d 90, 95, 656 N.E.2d 1010; R.C. 3745.06. Reliable evidence is evidence that can be trusted. *Our Place, Inc. v. Ohio Liquor Control Comm.* (1992), 63 Ohio St.3d 570, 571, 589 N.E.2d 1303. In order for evidence to be reliable, there must be a reasonable probability that it is true. Id. Probative evidence is evidence that tends to prove the issue in question, while substantial evidence is evidence that carries weight or evidence that has importance and value. Id.

{¶ 9} We first note that the Director contends that Salem's argument with regard to Ohio Adm.Code 3745–1–07(A)(6)(b), as well as other arguments in Salem's appellate brief, should be deemed waived because it was not adequately raised in its notice of appeal filed with the ERAC. However, the Director filed a pretrial motion with the ERAC based upon the same arguments and raised an objection on the same grounds again during the evidentiary hearing. The ERAC denied the Director's motion and overruled its objection and agreed to allow Salem to offer all evidence it deemed pertinent. The Director has not appealed the ERAC's decision in either respect. Nevertheless, we agree with the ERAC's conclusion that Salem should be permitted to introduce all evidence pertinent to the relevant issues. Therefore, this argument is without merit.

{¶ 10} Salem contends that the ERAC was required to apply the criteria in Ohio Adm.Code 3745–1–07(A)(6)(b), even though it found the requirements of R.C. 6111.03(J)(3) had been met. In its order, the ERAC specifically concluded the following:

The Commission finds that it need not address Appellant's argument relative to the application and interpretation of OAC 3745–1–07(A)(6)(b) in light of an

affirmative finding that the Director's action herein comports with the legal authority granted to the Director pursuant to RC Sec. 6111.03(J)(3).

{¶ 11} R.C. 6111.03(J)(3) provides:

To achieve and maintain applicable standards of quality for the waters of the state * * * the director shall impose, where necessary and appropriate, as conditions of each permit, water quality related effluent limitations * * *, and * * * shall give consideration to, and base the determination on, evidence relating to the technical feasibility and economic reasonableness of removing the polluting properties from those wastes and to evidence relating to conditions calculated to result from that action and their relation to benefits to the people of the state and to accomplishment of the purposes of this chapter.

{¶ 12} Ohio Adm.Code 3745–1–07(A)(6)(b) provides:

(A) Water quality standards contain two distinct elements: designated uses; and numerical or narrative criteria designed to protect and measure attainment of the uses.

* * *

(6) Biological criteria presented in table 7–15 of this rule provide a direct measure of attainment of the warmwater habitat, exceptional warmwater habitat and modified warmwater habitat aquatic life uses. Biological criteria and the exceptions to chemical-specific or whole-effluent criteria allowed by this paragraph do not apply to any other use designations.

* * *

(b) Demonstrated nonattainment of the applicable biological criteria in a water body with concomitant evidence that the associated chemical-specific aquatic life criteria and whole-effluent criteria are met will cause the director to seek and establish, if possible, the cause of the nonattainment of the designated use. The director shall evaluate the existing designated use and, where not attainable, propose to change the designated use. Where the designated use is attainable and the cause of the nonattainment has been established, the director shall, wherever necessary and appropriate, implement regulatory controls or make other recommendations regarding water resource management to restore the designated use. Additional regulatory controls shall not be imposed on point sources that are meeting all applicable chemical-specific and whole-effluent criteria unless:

(i) The point sources are shown to be the primary contributing cause of the nonattainment;

(ii) The application of additional or alternate treatment or technology can reasonably be expected to lead to attainment of the designated use; and

(iii) The director has given due consideration to the factors specified in division (J) of section 6111.03 of the Revised Code.

{¶ 13} The Director's response to Salem's contention seems to be threefold. The Director's first assertion in its brief appears to rely upon the same straight-forward rationale relied upon by the ERAC: that the language in R.C. 6111.03(J)(3), in and of itself, provides sufficient authority to impose the permit limits because it indicates that the Director "shall" impose limits where necessary and appropriate to maintain applicable standards of quality for waters of the state. We agree that, on its face, R.C. 6111.03(J)(3) contains the mandatory "shall" language that the Director and the ERAC point out. However, this simplistic argument fails to account for the equally plain language in Ohio Adm.Code 3745–1–07(A)(6)(b), which imposes other mandatory requirements upon the OEPA when issuing a permit with limitations based upon biological criteria. Our analysis may be different if the ERAC were not relying on the biological criteria. But when, as here, the ERAC uses the biological criteria as the basis for its analysis, merely looking at the language of R.C. 6111.03(J)(3) in isolation is inadequate.

{¶ 14} The central issue this court must decide is whether the ERAC was required to consider Ohio Adm.Code 3745–1–07(A)(6)(b) when reviewing the Director's action. To be sure, neither R.C. 6111.03 nor Ohio Adm.Code 3745–1–07 sets forth any procedural framework to direct the ERAC how to proceed in reviewing these types of cases. However, at oral argument, the Director seemed to concede that the ERAC was required to follow Ohio Adm.Code 3745–1–07(A)(6)(b) and specifically stated that he was not arguing that the OEPA's own regulations did not apply and the ERAC merely had to look to R.C. 6111.03 for guidance. Nevertheless, the Director proposed that the ERAC never, in fact, found it was not required to follow Ohio Adm.Code 3745–1–07(A)(6)(b). The Director claimed, albeit rather imprecisely, that the finding by the ERAC with regard to Ohio Adm.Code 3745–1–07(A)(6)(b), quoted above, actually related to the Director's pretrial motion, in which the Director argued that Salem's original appeal to the ERAC asserted only that the Director had no authority to impose limits on phosphorus and did not assert that the Director failed to lawfully apply Ohio Adm.Code 3745–1–07(A)(6)(b). The Director asserted that the ERAC's above-quoted finding was merely worded inartfully.

{¶ 15} We find the Director's argument, in this respect, untenable. A plain reading of the passage at issue would indicate that the ERAC believed that it was not required to follow Ohio Adm.Code 3745–1–07(A)(6)(b) in the present case and that R.C. 6111.03(J)(3) provided all the necessary authority to limit the phosphorus levels. Further, the ERAC had already addressed the Director's pretrial motion and decided to allow Salem to present any argument and evidence it

believed relevant. The ERAC mentioned the motion and its disposition in a footnote in the order and would have had no reason to revisit the issue in its conclusions of law.

{¶ 16} We are cognizant that courts must give due deference to an administrative agency's interpretation of its own administrative rules. See *Hamilton Cty. Bd. of Mental Retardation & Developmental Disabilities v. Professionals Guild of Ohio* (1989), 46 Ohio St.3d 147, 545 N.E.2d 1260. The General Assembly created these administrative bodies to facilitate certain areas of the law by placing the administration of those areas before boards or commissions composed of individuals who possess special expertise. See *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 614 N.E.2d 748, paragraph one of the syllabus. Thus, the Ohio Supreme Court has held that unless the construction is unreasonable or repugnant to that statute or rule, this court should follow the construction given to it by the agency. *Leon v. Ohio Bd. of Psychology* (1992), 63 Ohio St.3d 683, 590 N.E.2d 1223.

{¶ 17} However, in the present case, after reviewing Ohio Adm.Code 3745–1–07(A)(6)(b), we find it inescapable that the Director and the ERAC must consider this regulation when seeking to impose permit discharge limitations based upon the nonattainment of the applicable biological criteria. The plain language of Ohio Adm.Code 3745–1–07(A)(6)(b) sets forth the conditions that must be met before nonattainment of the applicable biological criteria can be used to impose additional regulatory controls. The parties agree that there was nonattainment of the biological criteria in the present case. Thus, it follows that the Director and the ERAC must follow the Ohio Adm.Code 3745–1–07(A)(6)(b) guidelines when seeking to base a permit limitation upon nonattainment of biological criteria. It is apparent from the ERAC's conclusions of law in its order that it did not consider Ohio Adm.Code 3745–1–07(A)(6)(b) and, in fact, believed it was not required to consider the regulation, even though the ERAC used the biological criteria as a basis for its decision. Because the ERAC's interpretation of the regulation is not consistent with the plain language of the regulation itself, we need not give its interpretation deference. See *Jones Metal Prods. Co. v. Walker* (1972), 29 Ohio St.2d 173, 181, 58 O.O.2d 393, 281 N.E.2d 1. Therefore, we find that the ERAC's interpretation that it was not required to apply Ohio Adm.Code 3745–1–07(A)(6)(b) in the present case was unreasonable and its consideration of only R.C. 6111.03(J)(3) was not in accordance with law.

{¶ 18} In his second counterargument, the Director contends that, even if Ohio Adm.Code 3745–1–07(A)(6)(b) must be followed when basing a permit limitation upon nonattainment of biological criteria, Ohio Adm.Code 3745–1–04(A) and (E) provided independent "applicable standards of quality for the waters"

under R.C. 6111.03(J)(3) in the present case, so the ERAC did not have to address Ohio Adm.Code 3745–1–07(A)(6)(b). Ohio Adm.Code 3745–1–04(A) and (E) provide:

The following general water quality criteria shall apply to all surface waters of the state including mixing zones. To every extent practical and possible as determined by the director, these waters shall be:

(A) Free from suspended solids or other substances that enter the waters as a result of human activity and that will settle to form putrescent or otherwise objectionable sludge deposits, or that will adversely affect aquatic life;

\* \* \*

(E) Free from nutrients entering the waters as a result of human activity in concentrations that create nuisance growths of aquatic weeds and algae[.]

{¶ 19} However, we find that we need not determine whether Ohio Adm.Code 3745–1–04(A) and (E) provided independent grounds so as to make the findings under Ohio Adm.Code 3745–1–07(A)(6)(b) unnecessary. It is clear from the ERAC's order that its determination was not based upon Ohio Adm.Code 3745–1–04(A) and (E). Although both sections are cited in the ERAC's order, and the ERAC discussed TSS and the growth of aquatic weeds and algae, there was no indication that the ERAC performed an analysis under either Ohio Adm.Code 3745–1–04(A) or (E). Rather, the ERAC's analysis and conclusions of law focused upon the more specific water quality standards and biological criteria contained in Ohio Adm.Code 3745–1–07 and its tables. Therefore, we find this counterargument by the Director to be without merit.

{¶ 20} The Director contends in its third counterargument that even if Ohio Adm.Code 3745–1–04(A) and (E) did not provide independent grounds and the ERAC was required to follow the requirements of Ohio Adm.Code 3745–1–07(A)(6)(b), the specific factual findings the ERAC made regarding R.C. 6111.03(J)(3) were sufficient to satisfy the conditions in Ohio Adm.Code 3745–1–07(A)(6)(b). However, we decline to address this issue for the first time on appeal. Although it may be within the authority of this court to review the evidence in the record to determine compliance with the regulation pursuant to R.C. 3745.06, we believe that whether the requirements of Ohio Adm.Code 3745–1–07(A)(6)(b) have been met in the present case should be first determined by the ERAC upon remand. It is the ERAC's unique duty to determine whether the Director's action was unreasonable or unlawful given the evidence presented at the de novo hearing. See *CECOS Internatl., Inc. v. Shank* (1992), 79 Ohio App.3d 1, 6, 606 N.E.2d 973 (in reviewing a decision of the Director, the ERAC considers whether the Director's action was unreasonable or unlawful, given the evidence presented at the de novo hearing; in contrast, an appellate court is charged with determining whether the ERAC's order concerning the reasonable-

ness and lawfulness of the Director's decision is supported by reliable, probative, and substantial evidence and is in accordance with law); see, also, R.C. 3745.05 (ERAC's standard of review) and R.C. 3745.06 (appellate court's standard of review). As the ERAC has made no determinations with regard to Ohio Adm.Code 3745–1–07(A)(6)(b), this court is unable to carry out its review under R.C. 3745.06 until the ERAC has done so. Therefore, we must remand the matter to the ERAC for further proceedings. For these reasons, Salem's first assignment of error is sustained.

{¶ 21} Salem argues in its second assignment of error that the ERAC's failure to find that the Director's action was precluded by the limitations set forth in Ohio Adm.Code 3745–1–07(A)(6)(b) was not supported by reliable, probative, and substantial evidence and was not in accordance with law. Salem contends that at least two of the mandatory conditions in Ohio Adm.Code 3745–1–07(A)(6)(b) were so clearly not established in the record that no remand is necessary. First, Salem contends that the record shows that the applicable numeric criteria for TDS and manganese were not met at the time the biological impairment to the Middle Fork was demonstrated, as required by Ohio Adm.Code 3745–1–07(A)(6)(b). Second, Salem contends that the Director did not give "due consideration" to the economic reasonableness of imposing the phosphorus limits in Salem's permit or to the benefits to the people of the state, as required by R.C. 6111.03(J)(3) via Ohio Adm.Code 3745–1–07(A)(6)(b)(iii). However, as explained under Salem's first assignment of error, we decline to address the requirements of Ohio Adm.Code 3745–1–07(A)(6)(b) for the first time on appeal. The arguments raised by Salem in its second assignment of error are best left for consideration by the ERAC upon remand. Therefore, Salem's second assignment of error is moot.

{¶ 22} Salem argues in its third assignment of error that the ERAC's finding that the specific numeric limits for phosphorus of 1.0 mg/l (weekly) and 1.5 mg/l (monthly) included in Salem's permit were "necessary and appropriate" to achieve applicable water-quality standards was not supported by reliable, probative, and substantial evidence and was not in accordance with law. However, given the foregoing resolution of Salem's other assignments, the specific numeric limits for phosphorus will be reviewed again upon remand. Therefore, Salem's third assignment of error is moot.

{¶ 23} Accordingly, Salem's first assignment of error is sustained, Salem's second and third assignments of error are moot, the order of the ERAC is reversed, and this matter is remanded to the ERAC for proceedings consistent with this opinion. We note that on remand, it may be possible for the OEPA to more specifically identify, and for the ERAC to more specifically uphold, grounds

that are independent of the biological criteria and, therefore, grounds that do not require an analysis of the biological criteria rule.

Order reversed
and cause remanded.

FRENCH and MCGRATH, JJ., concur.