**CITY OF SALEM, Appellant,**

v.

**KORLESKI, Dir. of Environmental Protection, Appellee.**

[Cite as *Salem v. Korleski,* 188 Ohio App.3d 20, 2010-Ohio-1145.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 09AP–620.

Decided March 23, 2010.

Squire, Sanders & Dempsey, L.L.P., David W. Burchmore, and Kendra Sherman, for appellant.

Richard Cordray, Attorney General, and Bridget Coontz, Assistant Attorney General, for appellee.

TYACK, Presiding Judge.

{¶ 1} Appellant, the city of Salem, operates a wastewater treatment plant ("WWTP") that discharges into the Middle Fork of Little Beaver Creek in Columbiana County. In 2002, appellee, Christopher Korleski, director of the Ohio Environmental Protection Agency ("OEPA"), issued a renewal National Pollutant Discharge Elimination System ("NPDES") permit to the city that included a limit on the amount of total phosphorus that the city could discharge into the Middle Fork.

{¶ 2} The city appealed the issuance of the permit to the Environmental Review Appeals Commission ("ERAC"), contending that in order to meet the phosphorus limitation, the city would have to install a phosphorus-removal system that was estimated at the time to cost approximately $3.5 million to install, $1,333,000 to meet the phosphorus limit, and $185,000 in additional operation and maintenance costs per year. ERAC upheld the director's decision, and the city appealed to this court in the case of *Salem v. Koncelik,* 164 Ohio App.3d 597, 2005-Ohio-5537, 843 N.E.2d 799.

{¶ 3} This court reversed the order of ERAC and remanded the matter with instructions for ERAC to consider Ohio Adm.Code 3745–1–07(A)(6)(b), also known as the biological-criteria rule. This rule limits the controls that the director can impose, such as a specific limit for phosphorus, unless certain biological criteria are met. This court also noted that on remand, there might be independent grounds for imposing a phosphorus limit outside of the biological-criteria rule.

{¶ 4} On remand, ERAC analyzed the evidence and concluded that the director had fully satisfied the conditions of the rule. ERAC declined to review any other independent basis that the director may have relied upon to impose a phosphorus limit.

{¶ 5} The city appealed the final order of ERAC to this court, assigning the following as error:

I. The Commission's ruling that the [sic] each of the conditions set forth in OAC § 3745–1–07(A)(6)(b) were satisfied by the Director is not supported by reliable, probative and substantial evidence and is not in accordance with law, because the applicable criteria for dissolved solids were not being met at the time when nonattainment of the biological criteria was observed.

II. The Commission's finding that the specific numeric limits for phosphorus of 1.0 mg/l (weekly) and 1.5 mg/l (monthly)[1] included in Salem's NPDES permit were necessary and appropriate to ensure attainment of the applicable biological criteria is not supported by reliable, probative and substantial evidence and is not in accordance with law.

{¶ 6} On appeal from a final order of ERAC, this court must determine whether ERAC's order as to the lawfulness and reasonableness of the director of the OEPA is supported by reliable, probative, and substantial evidence and is in accordance with law. Id. at ¶ 8.

{¶ 7} Discharge of pollutants into Ohio waterways is prohibited unless authorized through an NPDES permit. 33 U.S.C. 1311(a); R.C. 6111.04. The director of the OEPA is required to establish and implement water-quality standards. R.C. 6111.03 provides as follows:

The director of environmental protection may do any of the following:

\* \* \*

(J) \* \* \*

\* \* \*

(3) To achieve and maintain applicable standards of quality for the waters of the state adopted pursuant to section 6111.041 [6111.04.1] of the Revised Code, the director shall impose, where necessary and appropriate, as conditions of each permit, water quality related effluent limitations in accordance with sections 301, 302, 306, 307, and 405 of the Federal Water Pollution Control Act and, to the extent consistent with that act, shall give consideration to, and base the determination on, evidence relating to the technological feasibility and economic reasonableness of removing the polluting properties from those wastes and to evidence relating to conditions calculated to result from that action and their relation to benefits to the people of the state and to accomplishment of the purposes of this chapter.

---

1. In this court's earlier decision and during the course of these proceedings, these figures were reversed, and the actual limits are a weekly average of 1.5 mg/l and a monthly average of 1.0 mg/l for phosphorus.

{¶ 8} Water-quality standards are established by rule. The rule concerning the application of Ohio's biological criteria at issue in this case, Ohio Adm.Code 3745–1–07, provides:

(A) Water quality standards contain two distinct elements: designated uses; and numerical or narrative criteria designed to protect and measure attainment of the uses.

\* \* \*

(6) Biological criteria presented in table 7–15 of this rule provide a direct measure of attainment of the warmwater habitat, exceptional warmwater habitat and modified warmwater habitat aquatic life uses. Biological criteria and the exceptions to chemical-specific or whole-effluent criteria allowed by this paragraph do not apply to any other use designations.

\* \* \*

(b) Demonstrated nonattainment of the applicable biological criteria in a water body with concomitant evidence that the associated chemical-specific aquatic life criteria and whole-effluent criteria are met will cause the director to seek and establish, if possible, the cause of the nonattainment of the designated use. The director shall evaluate the existing designated use and, where not attainable, propose to change the designated use. Where the designated use is attainable and the cause of the nonattainment has been established, the director shall, wherever necessary and appropriate, implement regulatory controls or make other recommendations regarding water resource management to restore the designated use. Additional regulatory controls shall not be imposed on point sources that are meeting all applicable chemical-specific and whole-effluent criteria unless:

(i) The point sources are shown to be the primary contributing cause of the nonattainment;

(ii) The application of additional or alternate treatment or technology can reasonably be expected to lead to attainment of the designated use; and

(iii) The director has given due consideration to the factors specified in division (J) of section 6111.03 of the Revised Code.

{¶ 9} In other words, only when a stream is meeting its water-quality chemical criteria and still not meeting water-quality biological controls does this rule allow the director to impose additional regulatory controls.

{¶ 10} The OEPA conducted biological sampling of the Middle Fork in a stream survey in 1999. The following description from our first decision in Salem sets forth the relevant facts from that survey:

Salem owns and operates a municipal wastewater-treatment plant ("WWTP") that, pursuant to a permit issued by the Ohio Environmental Protection

Agency ("OEPA"), discharges effluent into the Middle Fork of Little Beaver Creek ("Middle Fork") at approximately River Mile ("RM") 38.2. In 1999, the OEPA conducted a routine stream survey, during which it performed biological and chemical sampling of the Middle Fork. As a result of the sampling, the OEPA discovered that the concentrations of phosphorus immediately downstream from the WWTP increased dramatically. The OEPA found that at RM 38.3, which is immediately upstream from the WWTP, phosphorus was measured at 0.19, 0.08, and 0.1 milligrams per liter ("mg/l"). The OEPA also found that at RM 37.8, the first sampling location downstream from the WWTP, phosphorus was measured at concentrations from 8.6 to 17.0 mg/l. Phosphorus concentrations decreased as the river flowed downstream from the WWTP toward the mouth of Middle Fork. Further, the OEPA found that downstream from the WWTP, there existed considerable amounts of sewage solids, while similar solids were not seen in Middle Fork upstream of the WWTP.

In addition, the OEPA evaluated the Middle Fork to determine whether the stream was attaining its designated uses, using two biological indices: the Index of Biotic Integrity ("IBI") and the Modified Index of Well Being ("MIWB"). The 1999 stream survey indicated that the IBI and MIWB scores reflect that the Middle Fork was not meeting the biological criteria at numerous locations downstream from the WWTP. Further, lesions and fin erosions, which are associated with excessive nutrients, were also observed on fish in the Middle Fork.

*Salem,* 164 Ohio App.3d 597, 2005-Ohio-5537, 843 N.E.2d 799, at ¶ 2–3.

{¶ 11} In its first assignment of error, the city argues that certain conditions were not met and that a correct interpretation of the rule leads to the conclusion that the director was not authorized to impose a specific limit on phosphorus. The city argues that the analysis of the data with respect to total dissolved solids, or TDS, was flawed in two respects.

{¶ 12} First, the city argues that ERAC incorrectly relied upon the average of all samples taken over the entire period of 47 days and that Ohio requires a 30-day average. The city argues that under a 30-day average, the Middle Fork was not meeting its water-quality chemical criteria, and therefore under the biological-criteria rule, the director was not authorized to impose a specific limit on phosphorus.

{¶ 13} Second, the city contends that in measuring dissolved solids, it was error for ERAC to rely on only one set of figures, field conductivity using milligrams per liter of TDS, and not to take into account another laboratory measure, specific conductance. Under the city's analysis of the data, a 30-day average of both the field and laboratory measurements shows that TDS exceeded the applicable water-quality standard.

{¶ 14} Therefore, the city argues, if the numeric criteria for TDS were being exceeded at the time of the sampling, there would be no "concomitant evidence that the associated chemical-specific aquatic-life criteria and whole-effluent criteria [were] met." Thus, under the biological-criteria rule, "additional regulatory controls" could not be imposed. Ohio Adm.Code 3745–1–07(A)(6)(b).

{¶ 15} The OEPA contends that there is no 30-day rule for TDS. Moreover, the OEPA argues that the record supports the conclusion that the standard relied upon by ERAC is a more reliable and direct method of measuring TDS when both conductivity and actual TDS measurements are available for the same samples. The OEPA concludes that because the average of samples was below the 1500 mg/l level established by rule for TDS, there was reliable, probative, and substantial evidence that the waters of the Middle Fork were in compliance with the standard for TDS.

{¶ 16} We agree. The rule speaks of concomitant evidence rather than a strict 30-day period. Ohio Adm.Code 3745–1–07(A)(6)(b) states: "Demonstrated nonattainment of the applicable biological criteria in a water body with concomitant evidence that the associated chemical-specific aquatic life criteria and whole-effluent criteria are met will cause the director to seek and establish, if possible, the cause of the nonattainment of the designated use." The city has not provided a reference to a 30-day rule, and therefore, we cannot find a basis in law to apply a 30-day rule to the average of TDS samples from the 1999 stream survey. Giving due deference to the OEPA's interpretation of its own administrative rules, the argument is not well taken. *Salem,* 164 Ohio App.3d 597, 2005-Ohio-5537, 843 N.E.2d 799, at ¶ 6.

{¶ 17} The record shows that some of the samples for TDS exceeded the 1500 mg/l level set forth in Ohio Adm.Code 3745–1–07, Table 7–1. But the average of the samples did not. In addition, there was testimony that the field conductivity tests were considered more accurate than the laboratory tests, and therefore there was no error in ERAC relying upon that data. Even applying the city's own chart using a 30–day rule to the TDS in question reveals a 30–day average of 1424 mg/l, which is below the water-quality standard of 1500 mg/l.

{¶ 18} The first assignment of error is overruled.

{¶ 19} In its second assignment of error, the city contends that there is a lack of reliable, probative, and substantial evidence to support the phosphorus limits imposed in the permit. The city argues that the permit limits are unreasonable, since a higher limit might still result in compliance with the water-quality standards for the Middle Fork. The city notes that the stream is in full attainment of biological criteria at certain areas downstream from the WWTP even with phosphorus levels much higher than the 1.0 mg/l monthly average

specified in the permit. Therefore, even if this court were to rule that under the biological-criteria rule there should be some limit on phosphorus, the city argues that the NPDES limit is unreasonable and unnecessary.

{¶ 20} In *Salem*, this court said that ERAC's consideration of R.C. 6111.03(J)(3) in isolation was error as a matter of law because it failed to consider the biological-criteria rule in conjunction with the statute. 164 Ohio App.3d 597, 2005-Ohio-5537, 843 N.E.2d 799, at ¶ 17. On remand, ERAC reviewed the evidence pertaining to the biological-criteria rule and found the conditions to have been satisfied. The remaining inquiry under Ohio Adm.Code 3745–1–07(A)(6)(b)(iii) is whether the director has given due consideration to the factors specified in R.C. 6111.03(J). These factors are whether the limitations are necessary and appropriate and whether the director has given consideration to the "technical feasibility and economic reasonableness of removing the polluting properties from those wastes and to evidence relating to conditions calculated to result from that action and their relation to benefits to the people of the state and to accomplishment of the purposes of this chapter." R.C. 6111.03(J)(3).

{¶ 21} The city attempts to graft a further condition on the statute that would require the director to prove that higher total phosphorus limits would result in nonattainment of the Middle Fork's designated use. Evidence that attainment could be reached with a higher limit is relevant to the economic reasonableness and necessity of the limit. To the extent that the city attempted to show that the permit limits were unreasonable, the city showed only that portions of the stream reached biologic attainment with higher phosphorus levels while other portions did not. At no point did the stream reach its intended goal of 1.0 mg/l.

{¶ 22} The evidence is inescapable that phosphorus from the WWTP was negatively affecting the health of the stream. Two witnesses testified that they had never seen phosphorus levels as high as those in the Salem WWTP effluent. This amount of phosphorus was extremely high even among WWTPs that do not treat for phosphorus. There was expert testimony that phosphorus from the WWTP effluent was the primary cause of the poor health of the stream and limited diversity of the fish community downstream of the plant. Final Order (Dec. 16, 2004), at ¶ 54. Effluent limitations are confined to chemical-specific criteria that are either promulgated in the water-quality regulations or derived individually pursuant to regulatory authority. According to the OEPA employee who prepared the fact sheet for the NPDES permit, the individually derived criteria are for chemicals that have been identified as pollutants that impair streams. Phosphorus is an individually derived criterion, due to its site-specific adverse effects. A permit-specific limit for phosphorus is frequently inserted in NPDES permits for WWTPs, and a limit of 1.0 mg/l discharged on a monthly average and 1.5 mg/l discharged on a weekly average is typical. Id. at ¶ 48.

{¶ 23} The basis for this limit in this case was, first, that the WWTP's effluent is the primary contributor to the presence of elevated phosphorus in the Middle Fork. Second, the 1.0 mg/l limit is very readily achievable by well-known treatment processes that are used by WWTPs throughout the state. Id. at ¶ 49. OEPA environmental engineer John Kwolek testified that 1.0 mg/l monthly and 1.5 mg/l weekly are "typical phosphorus limits" inserted into permits when the OEPA determines that it is appropriate to regulate phosphorus in a receiving stream. Id. at ¶ 56. There was also evidence of economic reasonableness in that the parties discussed cost compliance and that during negotiations prior to the final issuance of the permit, the OEPA agreed to relax limits in the permit on total suspended solids, resulting in a cost savings to the city of at least $3,435,000.

{¶ 24} We find reliable, probative, and substantial evidence supporting ERAC's determination that the phosphorus limitation was lawfully and reasonably imposed. The second assignment of error is overruled.

{¶ 25} Therefore, based on the foregoing, the two assignments of error are overruled, and the final order of the Environmental Review Appeals Commission is affirmed.

Judgment affirmed.

KLATT and McGRATH, JJ., concur.