[Cite as *Oxford Mining Co., L.L.C. v. Nally*, 2015-Ohio-182.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Oxford Mining Company, LLC., | : | |
| Appellant-Appellant/<br>Cross-Appellee, | : | |
| | : | No. 13AP-883 |
| v. | | (ERAC No. 12-256581) |
| | : | |
| Scott Nally, Director of Environmental<br>Protection, | : | (REGULAR CALENDAR) |
| Appellee-Appellee/<br>Cross-Appellant. | : | |
| | : | |

D E C I S I O N

Rendered on January 22, 2015

*Baker & Hostetler LLP, Maureen A. Brennan, Jason P. Perdion,* and *Andrew T. Johnson,* for appellant/cross-appellee and for amicus curiae Ohio Coal Association.

*Michael DeWine,* Attorney General, *L. Scott Helkowski, Kristina E. Tonn,* and *Gregg Bachmann,* for appellee/cross-appellant.

APPEALS from the Environmental Review Appeals Commission

DORRIAN, J.

{¶ 1} Appellant/cross-appellee, Oxford Mining Company, LLC ("Oxford"), appeals the order of the Environmental Review Appeals Commission ("ERAC") affirming specific portions of Oxford's Section 401 Water Quality Certification ("Section 401 Certification") that prohibit impact to certain wetlands. Appellee/cross-appellant, the Director of the Ohio Environmental Protection Agency ("Director"), filed a cross-appeal appealing the same order finding unreasonable and unlawful other portions of the Section

401 Certification that impose requirements if certain endangered species are encountered during construction or dredging.  For the following reasons, we affirm in part and reverse in part ERAC's order.

## I. Facts and Procedural History

{¶ 2}   Oxford operates several surface mining sites in Ohio.  Oxford obtained a coal mining and reclamation permit from the Ohio Department of Natural Resources ("ODNR") on September 22, 2011, concerning approximately 1,100 acres in Guernsey and Muskingum counties, known as the Otsego I site ("Otsego").  The mining project would impact several streams and wetlands and, therefore, Oxford was required to apply for a Section 404 permit from the United State Army Corps of Engineers pursuant to 33 U.S.C. 1344.  In conjunction, Oxford applied for a Section 401 Certification ("Section 401 Application") from the Ohio Environmental Protection Agency ("Ohio EPA") on February 18, 2011.  On March 14, 2011, the Ohio EPA sent Oxford a "Notice of Incompleteness."  After Oxford revised its application, the Ohio EPA sent Oxford a second Notice of Incompleteness.  On November 23, 2011, the Ohio EPA notified Oxford its application was complete.[1]

{¶ 3}   In its Section 401 Application, Oxford proposed mining approximately 1.7 million tons of coal using three methods, primarily highwall mining, but also contour strip mining and auger mining.  The streams and wetlands that would be impacted from the mining are located in the White Eyes Creek watershed. Oxford hired Strategic Environmental and Ecological Services ("Strategic") to perform a stream and wetland assessment at the Otsego site.  To assess the streams, Strategic completed Headwater Habitat Evaluation Index ("HHEI") evaluations for each stream and categorized each stream into a Primary Headwater Habitat ("PHWH"), pursuant to the Ohio EPA's Field

---

[1] The steps involved in a Section 401 review are:  (1) participating in a recommended, but voluntary, pre-application meeting between an applicant and an Ohio EPA Coordinator to discuss a project in the early planning stages; (2) submitting a complete Section 401 Certification application; (3) reviewing completeness in 15 days, where the Ohio EPA must review an application within 15 days of submission and notify the applicant regarding the application's completeness; (4) providing public notice of the application for the project; (5) having a mid-project review; and (6) paying applicable fees.  *See* Ohio EPA, *Water Quality Certification and Isolated Wetland Permits*, http://epa.ohio.gov/dsw/401/permitting.aspx#149524498-water-quality-certifications (accessed Dec. 15, 2014).

Evaluation Manual ("Field Evaluation Manual"). To assess the wetlands, Strategic utilized the Ohio Rapid Assessment Method ("ORAM").

{¶ 4} Oxford also submitted a Stream and Wetland Mitigation Plan ("Mitigation Plan") as part of its Section 401 Application. The Mitigation Plan called for Oxford to restore the streams by natural reconstruction techniques and to create at least 10.8 acres of wetlands to replace the 5.82 acres of wetlands that would be lost due to the mining. (Director's Exhibit 3, Table 3.)

{¶ 5} As part of its review of Oxford's Section 401 Application, Ohio EPA employees conducted three site visits to verify the HHEI evaluations and conduct biological and water quality sampling of the streams, using the Field Evaluation Manual. The results of the stream assessments prompted the Director to recategorize some of the streams and also require immediate cessation of construction or dredging if certain endangered species are encountered. During the site visits, Ohio EPA staff also set out to verify the results of Oxford's ORAM quantitative ratings of the wetlands. The results of the ORAM quantitative rating verification prompted the Ohio EPA to upgrade the classification of two wetlands, Wetland 71 and Wetland 72, from Category 2 to Category 3.

{¶ 6} On February 2, 2012, the Ohio EPA sent Oxford a draft Section 401 Certification for review. After several meetings and emails, the Ohio EPA made some changes to the draft. On February 7, 2012, the Ohio EPA issued to Oxford a final Section 401 Certification. The Section 401 Certification imposed restrictions to impacts on certain streams and also required Oxford to immediately cease construction and dredging and to contact the ODNR Division of Wildlife if the Eastern Massagua rattlesnake and native mussels and/or mussel beds are encountered. The Section 401 Certification prohibited impacts to Wetland 71 and permitted only a temporary road crossing within Wetland 72.

{¶ 7} Oxford filed a notice of appeal to ERAC. Oxford then filed a motion for summary judgment, arguing that the Section 401 Certification restrictions on streams were unlawful because they were based on PHWH classifications. After a hearing, ERAC granted Oxford's motion, finding that, to the extent the Director relied on the Field Evaluation Manual to expand definitions of one or more of the "use designations" found in Ohio Adm.Code 3745-1-07 regarding the streams, such action was unlawful. This finding is not subject to appeal, and we will not address it further.

{¶ 8}  ERAC then held a de novo hearing on the remaining issues raised in Oxford's appeal.  ERAC issued its decision on September 18, 2013.  There were four major findings by ERAC.[2]  Relevant here, ERAC determined to be unreasonable and unlawful the portions of the Section 401 Certification which required that construction/dredging immediately cease and ODNR be contacted if certain endangered species are encountered.  This determination and reversal is the main subject of the Director's cross-appeal.  However, ERAC affirmed the prohibition on impacts to Wetlands 71 and 72 and their classification as Category 3 wetlands.  Wetlands 71 and 72 are the main subject of Oxford's appeal.  ERAC remanded the Section 401 Certification to the Director with instructions to issue a modified certification.  Oxford appealed ERAC's order to this court, and the Director filed a cross-appeal.

## II. Assignments of Error

{¶ 9}  Oxford filed a timely notice of appeal and presents the three following assignments of error:

> 1. The Environmental Review Appeals Commission ("ERAC") ignored the legal definition of a Category 3 wetland, thus its Decision is not in accordance with law.
>
> 2. ERAC improperly deferred to a non-credible, less experienced fact witness over the testimony of a credible expert, in contravention of its own and the Ohio Supreme Court's precedent, thereby allowing the Ohio Environmental Protection Agency's ("OEPA") incorrect and unilateral over-scoring of the wetlands to stand, resulting in a decision that is not grounded in reliable, probative, and substantial evidence or in accordance with the law.

---

[2] First, ERAC found that Part I.C.1, the stream impact table, and the buffer zone restrictions were unlawful because the Director applied PHWH classifications as existing uses in his evaluation of the Section 401 Application.  ERAC ordered the Director to reevaluate Oxford's proposed stream impacts in the context of existing uses, as defined in Ohio Adm.Code 3745-1-07. Second, ERAC found that the stream impact table unlawfully conditioned allowable stream impacts on "yet to be determined" stream classifications and that the Director has no authority to conditionally issue a Section 401 Certification. Third, ERAC found that the PHWH classification-based performance goals, the HHEI and Headwater Macroinvertebrate Field Evaluation Index ("HMFEI") testing requirements, and the requirement that Oxford demonstrate the streams continue to support *Litobrancha recurvata* were unlawful because they were included to protect the pre-mining PHWH classifications.  Fourth, ERAC found that the HHEI testing requirement was unreasonable.

3. ERAC failed to properly determine, despite the improper classification of the wetlands, that impacts were justified because the project meets a demonstrated public need.

{¶ 10} The Director filed a notice of cross-appeal and presents the following two assignments of error:

1. The Environmental Review Appeals Commission erred as a matter of law and procedure when it addressed conditions in a water quality certification concerning endangered species when those conditions were not raised as an assignment of error by the Appellant before the Commission.

2. The Environmental Review Appeals Commission erred as a matter of law when it concluded that the Director was not authorized to include conditions in a water quality certification concerning endangered species despite the Director's express authorization under Ohio Adm.Code 3745-1-05 and 3745-32-05 to consider the anticipated impact of a potential lowering of water quality on threatened and endangered species and to impose terms and conditions as are appropriate or necessary to ensure adequate protection of water quality.

## III. Standard of Review

{¶ 11} R.C. 3745.05(F) defines ERAC's powers in reviewing the Director's actions, as follows:

If, upon completion of the hearing, the commission finds that the action appealed from was lawful and reasonable, it shall make a written order affirming the action, or if the commission finds that the action was unreasonable or unlawful, it shall make a written order vacating or modifying the action appealed from.

{¶ 12} ERAC may not substitute its judgment for that of the Director regarding factual determinations. *Northeast Ohio Regional Sewer Dist. v. Shank*, 58 Ohio St.3d 16, 25 (1991). Thus, in reviewing the Director's decision, ERAC is limited to considering whether the Director's action was unreasonable or unlawful given the evidence at the de novo hearing. *Id.* at 24. "Unlawful" means "not in accordance with law." *Citizens Commt. to Preserve Lake Logan v. Williams*, 56 Ohio App.2d 61, 70 (10th Dist.1977). "Unreasonable" means "that which is not in accordance with reason, or that which has no

factual foundation." *Id.* "The reasonableness standard requires * * * ERAC to consider whether the actions it reviews have a valid factual foundation." *Washington Environmental Servs., L.L.C. v. Morrow Cty. Dist. Bd. of Health*, 10th Dist. No. 09AP-920, 2010-Ohio-2322, ¶ 24.

{¶ 13} In reviewing ERAC's orders, R.C. 3745.06 provides that this court "shall affirm the order" if we find that, "upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law. In the absence of such a finding, [the court] shall reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law."

{¶ 14} Reliable evidence is "evidence which can be trusted. In order for evidence to be reliable, there must be a reasonable probability that it is true. Probative evidence is evidence which tends to prove the issue in question, while substantial evidence is evidence which carries weight, or evidence which has importance and value." *Perrysburg v. Schregardus*, 10th Dist. No. 00AP-1403 (Nov. 13, 2001), citing *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571 (1992). In determining whether an ERAC order is supported by reliable, probative, and substantial evidence, this court must weigh and evaluate the credibility of the evidence. *Parents Protecting Children v. Korleski*, 10th Dist. No. 09AP-48, 2009-Ohio-4549, ¶ 10. "This process inevitably involves a consideration of the evidence and, to a limited extent, would permit a substitution of judgment by the reviewing court." *Tube City Olympic of Ohio, Inc. v. Jones*, 10th Dist. No. 03AP-295, 2004-Ohio-1464, ¶ 26, citing *Perrysburg* and *Andrews v. Bd. of Liquor Control*, 164 Ohio St. 275 (1955). In *Andrews*, the Supreme Court of Ohio discussed an appeal from an administrative agency and stated that "[t]he court must read and consider all the evidence offered by both sides and must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence and the weight thereof. In other words, the court may reverse, vacate or modify the order of the agency, unless it finds that it 'is supported by reliable, probative and substantial evidence and is in accordance with law.' " *Andrews* at 393-94.

## IV. Section 401 Certification

{¶ 15} The Federal Water Pollution Control Act, commonly known as the Clean Water Act, 33 U.S.C. 1251, et seq., "is a comprehensive water quality statute designed to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' " *Kentucky Waterways Alliance v. Johnson*, 540 F.3d 466, 469-70 (6th Cir.2008), citing *PUD No. 1 of Jefferson Cty. v. Wash. Dept. of Ecology*, 511 U.S. 700, 704 (1994), quoting 33 U.S.C. 1251(a). With the Clean Water Act, Congress had two goals: (1) to eliminate the discharge of pollutants into the nation's navigable waters, and (2) to attain "an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. 1251 (a)(1)-(2).

{¶ 16} There are two sets of water quality measures to achieve the goals. The first requires the United States Environmental Protection Agency ("US EPA") to enforce limitations on individual discharges into the nation's navigable waters from point-sources. The second requires each state, with federal approval, to " 'institute comprehensive water quality standards establishing water quality goals for all intrastate waters.' " *Kentucky Waterways* at 470, quoting *PUD No. 1* at 704. *See also* 33 U.S.C. 1311(b)(1)(C); 33 U.S.C. 1312. These water quality standards "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses. Such standards shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of [the Clean Water Act]." 33 U.S.C. 1313(c)(2)(A).

{¶ 17} In 1987, Congress amended the Clean Water Act to provide that these state-established water quality standards must include an antidegradation policy, which is "a policy requiring that state standards be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation." *PUD No. 1* at 705. The US EPA regulations, specifically the federal antidegradation rule, require states to develop an antidegradation policy. 40 C.F.R. 131.1, 131.12(a).

{¶ 18} R.C. 6111.12(A) provides that the Ohio EPA "shall establish an antidegradation policy applicable to surface waters of the state pursuant to applicable federal laws and regulations." The purpose of Ohio's antidegradation policy is to "maintain levels of water quality that are currently better than prescribed by applicable

standards except in situations when a need to allow a lower level of water quality is demonstrated based on technical, social, and economic criteria." R.C. 6112.12(A). Chris Skalaski, an employee of the Ohio EPA for 21 years, testified that the purpose of the antidegradation policy is to ensure that water quality standards are maintained and protected.

{¶ 19} The Ohio EPA applies two rules in evaluating a Section 401 Application: (1) the certification rule (Ohio Adm.Code Chapter 3745-32) and (2) the antidegradation rule (Ohio Adm.Code 3745-1-05). The certification rule sets forth factors the Director must consider when evaluating a Section 401 Application. Ohio Adm.Code 3745-32-05(A)(1) provides that the Director shall not issue a Section 401 Certification unless he determines that the applicant will not "prevent or interfere with the attainment or maintenance of applicable water quality standards." The antidegradation rule requires that "existing uses"[3] be maintained and protected, by stating, "[e]xisting uses, which are determined using the use designations defined in rule 3745-1-07 of the Administrative Code, and the level of water quality necessary to protect existing uses, shall be maintained and protected." Ohio Adm.Code 3745-1-05(C)(1).

{¶ 20} Further, the antidegradation rule states that "[e]xisting wetland uses * * * shall be maintained and protected in accordance with rules 3745-1-50 to 3745-1-54 of the Administrative Code." Ohio Adm.Code 3745-1-05(C)(1). Ohio Adm.Code 3745-1-54 sets forth a specific wetland antidegradation rule, and the Ohio Administrative Code provides criteria for conducting a wetland antidegradation review. *See* Ohio Adm.Code 3745-1-50 to 3745-1-54. The wetland antidegradation rule provides that its provisions "apply in addition to the provisions in rule 3745-1-05 of the Administrative Code." Ohio Adm.Code 3745-1-54(A).

{¶ 21} " 'Wetlands' are areas where the water table is at, near, or above the land surface long enough each year to support the growth of water dependent vegetation and to result in the formation of characteristic wet soil types. These include marshes, swamps, bogs and similar areas." Ohio Adm.Code 3745-32-01(O). The wetland antidegradation rule states that "[e]ach wetland shall be assigned a category by Ohio EPA for the purposes

---

[3] " 'Existing uses' mean those uses actually attained in the water body after November 28, 1975." Ohio Adm.Code 3745-1-05(A)(8).

of reviews of projects pursuant to this rule." Ohio Adm.Code 3745-1-54(B)(2)(a). Pursuant to Ohio Adm.Code 3745-1-54(B)(2)(a), when the Director assigns a category, it will be "based on the wetland's [1] relative functions4 and values, [2] sensitivity to disturbance, [3] rarity, and [4] potential to be adequately compensated for by wetland mitigation." Furthermore, the Director must "consider the results of an appropriate wetland evaluation method(s) acceptable to the director, and other information necessary in order to fully assess the wetland's functions and values." Ohio Adm.Code 3745-1-54(A)(2)(ii).

{¶ 22} There are three categories of wetlands and the level of permissible impact depends on the wetland category. Ohio Adm.Code 3745-1-54, sets forth the categories, in pertinent part, as follows:

> (C) Wetland categories.
>
> * * *
>
> (2) Wetlands assigned to category 2.
>
> (a) Wetlands assigned to category 2 support moderate wildlife habitat, or hydrological or recreational functions as determined by an appropriate wetland evaluation methodology acceptable to the director or his authorized representative.
>
> (b) Wetlands assigned to category 2 may include, but are not limited to: wetlands dominated by native species but generally without the presence of, or habitat for, rare, threatened or endangered species; and wetlands which are degraded but have a reasonable potential for reestablishing lost wetland functions.
>
> (3) Wetlands assigned to category 3.
>
> (a) Wetlands assigned to category 3 support superior habitat, or hydrological or recreational functions as determined by an

---

4 The functions of a wetland may include, but are not limited to, the following: (1) ground water exchange, including the discharge and recharge of ground water; (2) nutrient removal and/or transformation; (3) sediment and/or contaminant retention; (4) water storage; (5) sediment stabilization; (6) shoreline stabilization; (7) maintenance of biodiversity, as that term is defined in Ohio Adm.Code 3745-1-50; (8) recreation; (9) education and research; and (10) habitat for threatened or endangered species. Ohio Adm.Code 3745-1-54(B)(2)(b).

> appropriate wetland evaluation methodology acceptable to the director or his authorized representative.
>
> (b) Wetlands assigned to category 3 may be typified by some or all of the following characteristics: high levels of diversity, a high proportion of native species, or high functional values.
>
> (c) Wetlands assigned to category 3 may include, but are not limited to: wetlands which contain or provide habitat for threatened or endangered species; high quality forested wetlands, including old growth forested wetlands, and mature forested riparian wetlands; vernal pools; and wetlands which are scarce, regionally and/or statewide including, but not limited to, bogs and fens.

Applicants for Section 401 Certification are required to file a "wetland characterization analysis consistent with the [ORAM]" if the project involves impacts to a wetland. R.C. 6111.30(A)(2).

{¶ 23} The ORAM version 5.0 User's Manual and Scoring Forms ("ORAM Manual"), published in February 2001, states that the ORAM was developed "to provide a relatively fast and easy method for determining the appropriate category of a particular wetland under the Wetland Antidegradation Rule, OAC Rule 3745-1-54." (ORAM Manual, 1.) The method is designed to identify the appropriate level of regulatory protection a particular wetland should receive. The ORAM consists of a series of questions found in five sections: (1) Background Information, (2) Scoring Boundary Worksheet, (3) Narrative Rating, (4) Quantitative Rating, and (5) Wetland Categorization Worksheets. The ORAM Manual indicates that "*[f]ailure to properly complete all questions may result in the incorrect categorization of the wetland.*" (Emphasis sic.) (ORAM Manual, 17.) The complete ORAM is ten pages long.

{¶ 24} As explained more fully herein, our analysis in this case turns on application and use of the Quantitative Rating section of the ORAM. The ORAM Manual offers the following brief summary of the Quantitative Rating section:

> The Quantitative Rating consist of six "metrics": wetland size (metric 1), upland buffers and surrounding land use (metric 2), hydrology (metric 3), habitat (metric 4), special wetland communities (metric 5), and vegetation, interspersion, and microtopography (metric 6). The score is on a 100 point scale.

(ORAM Manual, 17-18.)

**V. First Assignment of Error**

{¶ 25} In its first assignment of error, Oxford contends that ERAC ignored the legal definition of a Category 3 wetland; thus, its decision is not in accordance with law. Oxford argues that ERAC placed too much emphasis on the ORAM quantitative rating without considering the qualitative criteria set forth in either the applicable rule or the ORAM itself. Oxford further argues that these wetlands are actually Category 2 wetlands and Oxford should be permitted to impact them when mining the property. In response, the Director argues that the ORAM is considered an appropriate wetland evaluation methodology acceptable to the Director for purposes of assigning wetland categories. The Director states that the General Assembly has codified the use of ORAM at R.C. 6111.30(A)(2).

{¶ 26} As noted above, the wetland antidegredation rule set forth in Ohio Adm.Code 3745-1-54(B)(2)(a)(i) requires that the Director assign wetland categories based on consideration of four general criteria: the wetland's (1) relative functions and values, (2) sensitivity to disturbance, (3) rarity, and (4) potential to be adequately compensated for by wetland mitigation. Ohio Adm.Code 3745-1-54(B)(2)(a)(i). The rule further requires the Director to "consider the results of an appropriate wetland evaluation method(s) acceptable to the director, and other information necessary in order to fully assess the wetland's *functions and values*." (Emphasis added.) Ohio Adm.Code 3745-1-54(B)(2)(a)(ii). The plain reading of this rule indicates that the appropriate wetland evaluation methodology selected by the Director is required to fully assess only one of the four criteria–functions and values. In assigning wetland categories, however, the Director is required, pursuant to the same rule, to also consider the remaining three criteria—i.e., sensitivity to disturbance, rarity, and potential to be adequately compensated for by wetland mitigation. Furthermore, division (C)(3) of the same rule outlines the characteristics of wetlands assigned to Category 3. The "results of an appropriate wetland evaluation methodology" is only referenced with regard to determining whether the wetland supports "superior habitat, or hydrological or recreational *functions*." (Emphasis added.) Ohio Adm.Code 3745-1-54(C)(3)(a). Other

characteristics beyond the wetlands functions are also outlined and do not refer to the results of an appropriate wetland evaluation methodology. Ohio Adm.Code 3745-1-54(C)(3)(b) and (c).

{¶ 27} Regarding the assessment of whether a wetland can support superior habitat or hydrological or recreational functions, the parties do not dispute that ORAM is an appropriate wetland evaluation method acceptable to the Director. Oxford argues, however, that, even with regard to the assessment of functions and values, the results of the ORAM quantitative rating score alone cannot automatically determine the wetland category.

{¶ 28} Oxford submitted a wetland characterization using the ORAM to evaluate the wetlands. Strategic, specifically Robert Smith, completed the two-page ORAM quantitative rating and determined through six visits to the site that Wetlands 71 and 72 were Category 2 wetlands.   Smith submitted a detailed report in addition to the two-page ORAM quantitative rating. He testified at the hearing concerning several non-natural impacts he observed, including acid mine drainage in various locations, mostly seeps turned into streams which discharged into wetlands.  He testified that he also observed impoundments and invasive species in the wetlands, which typically are non-native plants that have adapted to thriving in disturbed areas and aggressively outcompete the naturally occurring native species that have not yet adapted to the disturbance.

{¶ 29} The Ohio EPA also conducted a site review to verify Oxford/Strategic's scoring of the wetlands. Rachel Taulbee, an Ohio EPA environmental specialist, completed the two-page ORAM quantitative rating.  While Taulbee agreed with some parts of Strategic's ORAM quantitative rating scoring, she determined that the wetlands had different scores in many of the metrics.  This resulted in Taulbee determining that both Wetlands 71 and 72 were Category 3 wetlands. (Director's Exhibit 23.)

{¶ 30} Taulbee testified at the de novo hearing.  She did not expressly testify that Wetlands 71 and 72 support superior habitat, hydrological, or recreational functions. Rather, her testimony regarding the wetlands focused on how and why she arrived at the ORAM quantitative rating score.  Regarding Metric 1–Wetland Area, Taulbee testified that she used the delinated wetland boundary completed by Strategic.

{¶ 31} Regarding Metric 2–Upland Buffers and Surrounding Land Use, Taulbee testified there were wide buffers greater than 50 meters on all sides.  In her opinion, the area outside the buffers was young second-growth forest.

{¶ 32} Regarding Metric 3–Hydrology, Taulbee testified that Wetland 71 receives groundwater as indicated by the abundance of skunk cabbage.  Additionally, Wetland 71 received hydrology from precipitation and perennial surface water from a connection with an existing impoundment.  She noted that Wetland 71 is part of a riparian corridor stream 129.  She further noted the maximum water depth of the wetland did not exceed 15 inches. She primarily used secondary indicators to determine the duration of inundation of saturation, including watermarks on trees, drift lines with vegetation, crayfish burrows, and vegetation communities.  She testified that the presence of skunk cabbage indicated the wetland was regularly inundated or saturated.  When considering the modifications in the natural hydrological regime, she explained that any disturbances impacting the hydrology must be considered.  She observed a dike and a logging road, which she determined had fully recovered since they happened so long ago.

{¶ 33} Regarding Metric 4–Habitat Alteration and Development, Taulbee testified that she observed selective cutting which had recovered. She also considered the source of vegetation, the development of the microtopography within the site, and the intactness of the wetland.  She opined that Wetland 71 "was not an excellent example of a wetland in this ecoregion, but it was not a fair or poor example. It was a good example. It had what we consider some high quality vegetation." (Tr. 1352.) "So overall the development of the wetland was — it was decent and it was good." (Tr. 1352.)

{¶ 34} Regarding Metric 5–Special Wetlands, Taulbee testified "it wasn't a bog and it wasn't a fen, and it wasn't a Lake Erie coastal wetland, so it wouldn't have fallen into this range of special wetlands so it wouldn't have automatically been a three or a one." (Tr. 1353.)

{¶ 35} Regarding Metric 6–Plant Communities, Interspersion and Micro-topography, Taulbee testified that the wetland was predominantly an emergent shrub wetland.  The emergent community was a significant part of the vegetation and of moderate quality.  She concluded that the interspersion of vegetation was moderately high and consisted of a monoculture of cattails, small forested areas, and shrubby areas,

as well as emergents and open water components. She observed invasive species, which indicates a disturbance, but not more than 25 percent of overall wetland. She also observed moderate amounts of coarse woody debris and tussocks but no hummocks. Additionally, she observed a bit of standing dead wood.

{¶ 36} Taulbee testified that she conducted the same analysis on Wetland 72 as she did on Wetland 71. Wetland 72 received an ORAM quantitative rating score five points higher than Wetland 71. According to Taulbee, the difference in score can be attributed to the fact that Wetland 72 is larger in size, has a larger open water component, and contained amphibian egg masses within the impoundments on the edges. On cross-examination, she stated that the egg mass was located within the portion of the wetland that exhibited wetland characteristics; however, she conceded that she could not testify that the egg mass was within the wetland because she did not have the GPS coordinates.[5]

{¶ 37} Taulbee testified that, after she completed her ORAM quantitative rating, she enlisted the assistance of Brian Gara, a wetland ecologist at the Ohio EPA, to assist her and verify her scores. ERAC recognized Gara as an expert in the areas of wetland assessment, botany, and wetland ecology. Gara testified that he confirmed Taulbee's Category 3 scores; however, he did not complete his own ORAM and testified from memory using Taulbee's form.

{¶ 38} After Oxford filed its notice of appeal with ERAC, Oxford hired an environmental consultant, Bob Madej, to provide an independent evaluation of Wetlands 71 and 72. Madej testified and presented his report. The parties stipulated that Madej is an expert in wetland delineation, wetland evaluation, ecological assessment as it relates to the site, aquatic biology as it relates to the site, and botany as it relates to wetland assessment and evaluation. Madej determined that Wetlands 71 and 72 were both Category 2 wetlands. Madej was the only witness to complete the full ten-page ORAM, including the qualitative background, boundary, and narrative rating sections of the ORAM as well as the quantitative rating.[6] Madej referred to the regulatory definition of

---

[5] Oxford argued that Taulbee could not possibly know if the egg masses were within the dimensions of the wetland because she did not know the jurisdictional boundary that was accepted by the Army Corps of Engineers.

[6] In the report Madej prepared, he noted that, in conducting the ORAM, all methods for the ORAM assessment followed the ORAM Manual. In addition to the ORAM, he also conducted a brief literature

wetland categories in his report. Finally, Madej testified regarding non-natural disturbances negatively affecting the wetlands, especially the presence of a power line through Wetland 72, which resulted in a higher ORAM score.

{¶ 39} ERAC found that the Ohio EPA had a valid factual foundation for classifying Wetlands 71 and 72 as Category 3. ERAC determined that, despite the differences in scoring, the Director reasonably assigned ORAM quantitative rating scores of 61 for Wetland 71 and 66 for Wetland 72, corresponding to a Category 3 classification. ERAC specifically found that, based on the presence or absence of invasive species, acid mine drainage, and non-natural disturbances, the Director reasonably assigned higher scores for these wetlands, resulting in their designation as Category 3 wetlands, rather than Category 2 wetlands. Oxford argues that ERAC ignored the definition of a Category 3 wetland in its decision. Oxford contends that ERAC did not analyze the concept of superiority but, rather, focused on the ORAM quantitative rating score and not the actual law.

{¶ 40} ERAC's conclusions regarding the wetlands consists of seven paragraphs. It also focuses exclusively on the ORAM quantitative rating score determined by Taulbee and her testimony regarding the same. ERAC does not mention the score determined by

---

review that included review of the soil survey and aerial photographs, which he included in his report as well as an evaluation of the vegetative species composition and wildlife habitats. He stated that "[d]isturbances, present and historic, to vegetation, hydrology, and the landscape were evaluated during the literature and field reviews." (Oxford Exhibit 41, 1.) He concluded that "Wetlands 71 and 72 were described through qualitative and quantitative ORAM rating as regulatory Category 2 wetlands. The altered hydrologic regime and significant presence of invasive species, as well as the observed moderate wildlife habitat, moderate hydrologic and lack of habitat for rare, threatened, or endangered species, indicate that these wetlands do not have superior functions of Category 3 wetlands and that Category 2 is the appropriate regulatory category. The subject wetlands do not support 'superior' habitat, superior hydrologic functions or high levels of diversity of native species. Therefore, Wetlands 71 and 72 do not meet criteria for regulatory Category 3 wetlands." (Oxford Exhibit 41, 7.) Madej completed the ORAM Narrative Rating, which requires the scorer to answer a series of eleven questions with one of the following answers: "Yes-Wetland should be evaluated for possible Category 3 status;" "Yes-Wetland is a Category 3 wetland"; or "No." (ORAM Manual, 12.) Madej answered "No" on each required question for both Wetlands 71 and 72. Consistent with his narrative scoring, his quantitative rating resulted in a score of 52 for Wetland 71 and 56 for Wetland 72. The Ohio EPA notes that Madej's report was submitted after Oxford filed its notice of appeal with ERAC. Nevertheless, because the hearing before ERAC was de novo, ERAC could properly consider Madej's evidence. Furthermore, the Ohio EPA would have had Madej's report available to its witnesses for review prior to their testifying before ERAC. Taulbee testified, however, that she was not familiar with Madej's report and that she really had not reviewed his report.

Gara in his testimony.[7]  Nor does ERAC mention or indicate it considered whether Taulbee's actual process in determining the ORAM quantitative rating scores was credible.

{¶ 41} The ORAM Manual was developed with the assistance of Ohio EPA's 401/Wetland Ecology Unit, as well as with the assistance of members of the ORAM Workgroup, including representatives from government agencies, academia, and private sector.  It is published under the name of the former Director of the Ohio EPA and the former Governor of the State of Ohio.[8]  Gara testified that this 2001 version 5.0 of the Manual is still in effect today.  The Manual states, as follows:

---

[7] Because Gara is not mentioned in its decision, we presume ERAC gave his testimony little to no weight. This is not surprising.  Although the Director argues that the testimony of and ORAM scores determined by Gara provide a valid factual foundation for the Director's determination, Gara himself testified that he did not score the site independent of anybody else.  He provided technical assistance to Taulbee on only three metrics: groundwater source, surrounding land use, and disturbances.  His involvement in this case was a "two-hour site visit, and * * * very little involvement, virtually no involvement, in this case since." (Tr. 2157.) He also testified that he is not an expert on the actual antidegradation rule. Gara's testimony belies the Director's suggestion in his brief that, "[a]fter a thorough review of the data and his own observations, Dr. Gara offered his expert opinion that both WL-71 and WL-72 were category 3 wetlands."  (Director's brief, 18.) Furthermore, the Director points to Gara's testimony in arguing that "there was expert testimony directly indicating that there was nothing on the ten-page form that would change the assessment of WL-71 and WL-72." (Director's brief, 40.)  That is not what Gara said, however; rather, he was referring to an even longer form than the now required ten-page form. On redirect, Gara testified that "[t]here's a long form that used to be included in the manual that fleshed out some of the discussions associated with each metric.  A few years back, that form was condensed down to a 10-page form, and it was requested that applicants would submit that 10-page form, and then there's also the two-page strictly quantitative rating." (Tr. 2198.) The Director's counsel asked, "Is there anything on the long form that would have changed the antidegradation category in this case?" to which Gara responded, "No, there is not." (Tr. 2198.)  The Director's counsel further asked, "Would you have needed to redo the scoring boundary because you didn't have a long form?" and Gara stated, "No." (Tr. 2198.)  He further testified regarding the ORAM methodology in general that the Director does not always do the ten-page form, even though he is aware that the manual indicates it is essential to follow the instructions to find a correct score. Oxford's counsel asked Gara, "And yet you know that all of those things [start with an evaluation of general area by looking at aerial photos and topographic maps, use checklist of items to complete for full ORAM, complete long form for ORAM, and complete scoring boundary worksheet] are indicated in the manual as being essential to find a correct score, correct?"  In response, he testified, "Well, a correct score in order to interpret that score and get it in the correct antidegradation category yes.  For our research, we're not putting it into an antidegradation category typically.  We're just using the ORAM as a disturbance metric, and so we're using the numeric score typically to compare to a more robust measurement." (Tr. 2150.)  This is contrary to what the Director suggests—i.e., that the ORAM quantitative rating score, by definition, places the wetland into a proper antidegradation category.  The ORAM Manual states that "The ORAM is designed to aid in the determination of wetland categories as defined in Ohio's Wetland Antidegradation Rule (OAC Rule 3745-1-54). As such the method is designed to identify the appropriate level of regulatory protection a particular wetland should receive." (ORAM Manual, 10.)

[8] Although not included in the record, we note the Ohio EPA website posts instructions for (1) the ORAM ten-page form for wetland categorization version 5.0 (Background Information, 617, Score Boundary Worksheet, Narrative Rating, Field Form Quantitative Rating, ORAM Summary Worksheet, Wetland

The numeric score obtained from the [ORAM] is not, and should not be considered, an absolute number with intrinsic meaning. The numeric score should be considered in light of other available information. * * *

* * *

In order to properly use the ORAM, it is critical to understand the controlling rule language for determining a wetland's category. The various parts of the ORAM are intended to incorporate the narrative descriptions by means of questions in the Narrative Rating Forms and the scoring scheme in the Quantitative Rating Form. *However, in the event of a conflict between the ORAM and the provisions in the Wetland Water Quality Standards and the Wetland Antidegradation Rule, the rule language should always be considered controlling.*

* * *

The use of the [ORAM] should not be considered as a substitute, and is not intended to be a substitute, for detailed studies of the functions and biology of a wetland. In addition, while the score and conclusions of the ORAM are designed such that they correlate well with more detailed measures of a wetland's biology, they are not, and should not, be considered absolutely definitive.

While every effort has been made to reduce the failure rate, and to increase the usability of the method, the Rater should be aware that as a "rapid", "qualitative" procedure, the method and especially, the quantitative score may incorrectly categorize a wetland. ***In all instances, the definitions and requirements found in OAC Rule 3745-1-54 are ultimately controlling, and in the event of a conflict between the ORAM and the rule, the definitions and requirements of the rule control.***

---

Categorization Worksheet, and (2) the ORAM Version 5.0 (Background Information, Score Boundary Worksheet, Narrative Rating, Quantitative Rating, Categorization Worksheets and Field Scoring Form). Both forms were published by the Ohio EPA, Division of Surface Water on February 1, 2001. The later form states: "Pursuant to ORC Section 3745.30, the Ohio Rapid Assessment Method for Wetlands is a guidance or policy and DOES NOT HAVE THE FORCE OF LAW." (Emphasis sic.) R.C. 3745.30(B)(4) provides that "[t]he first page of each policy [established by the Ohio EPA] shall have printed on it the following statement in uppercase letters: 'This policy does not have the force of law.' " The statute states that, "[a]s used in this section, 'policy' means a written clarification or explanation of a statute or rule that is initiated by the environmental protection agency." R.C. 3745.30(A)(1).

(Emphasis sic. ) (ORAM Manual, 1-2, 10.)

{¶ 42} The Director argues in essence that the ORAM quantitative rating score, by definition, constitutes the wetland category.  In support, the Director points to Ohio Adm.Code 3745-1-54(C)(3)(a) "[w]etlands assigned to category 3 support superior habitat, or hydrological or recreational functions *as determined by an appropriate wetland evaluation methodology acceptable to the director or his authorized representative.*" (Emphasis sic.) (Director's brief, 6.)  As noted above, the parties do not dispute, and we do not disagree, that ORAM is an appropriate wetland evaluation methodology acceptable to the Director.  Nevertheless, it is important to note that the statute and rule refer to the "Ohio Rapid Assessment Method," not just the Quantitative Rating portion of the same.

{¶ 43} Neither Taulbee nor Gara completed eight of the ten pages of the ORAM, including the Narrative Rating pages consisting of eleven questions "designed to determine whether a wetland is a Category 3 wetland."   The ORAM Manual states:

> It is very important to properly and thoroughly answer each of the questions in the Narrative Rating.  These questions are designed to categorize certain wetlands as very low quality (Category 1) or as very high quality (Category 3). ***Therefore, just completing the Quantitative Rating Questions gives an incomplete answer as to the wetland's regulatory category.***
>
> * * *
>
> It is very important to properly and thoroughly answer each of the questions in the Narrative Rating.  ***Just completing the Quantitative Rating may give an incomplete answer as to the wetland's regulatory category.***

(Emphasis sic.) (ORAM Manual, 17, 27.)

{¶ 44} Taulbee provided no explanation for why she did not complete the Narrative Rating portion of the ORAM, except to say that she was only verifying the quantitative rating scores submitted by Oxford.  Nevertheless, she admitted that the way to "assure the quality of the result from the ORAM quantitative scoring sheet, * * * is to follow the requirements in the ORAM manual" and that "[t]he manual is the document with the guidance on how to perform the ORAM." (Tr. 1579.)

{¶ 45} We are cognizant that courts must give due deference to an administrative agency's interpretation of its own administrative rules. *Salem v. Koncelik*, 164 Ohio App.3d 597, 2005-Ohio-5537, ¶ 16 (10th Dist.). The General Assembly created these administrative bodies to facilitate certain areas of the law by placing the administration of those areas before boards or commissions composed of individuals who possess special expertise. *Id.*, citing *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619 (1993), paragraph one of the syllabus. Thus, the Supreme Court of Ohio has held that, unless the construction is unreasonable or repugnant to that statute or rule, this court should follow the construction given to it by the agency. *Leon v. Ohio Bd. of Psychology*, 63 Ohio St.3d 683 (1992).

{¶ 46} Nevertheless, we cannot defer to ERAC or the Director's interpretation when it does not follow the plain words of its own rule or its own explanation and clarification regarding the same. Neither the Director nor ERAC followed the ORAM Manual. Therefore, we cannot find that ERAC's finding was in accordance with law.

{¶ 47} Accordingly, Oxford's first assignment of error is sustained.

## VI. Second Assignment of Error

{¶ 48} By its second assignment of error, Oxford contends that ERAC improperly deferred to a noncredible, less-experienced fact witness over the testimony of a credible expert, thereby allowing the Ohio EPA's incorrect and unilateral over-scoring of the wetlands to stand, resulting in a decision that is not grounded in reliable, probative, and substantial evidence. Oxford argues that ERAC should have discounted Taulbee's opinion and credited its own expert's opinion. Oxford presented the testimony of Smith and its expert, Madej, to argue that Wetlands 71 and 72 were Category 2 wetlands.

{¶ 49} In *Parents Protecting Children*, 2009-Ohio-4549, we noted that, when determining whether ERAC's order is supported by the requisite quantum of evidence, we must weigh and evaluate the credibility[9] of all the evidence presented to ERAC. "This process involves a consideration of the evidence and, to a limited extent, would permit a

---

[9] In this case, the question of credibility does not involve consideration of factors such as the appearance of each witness upon the stand, manner of testifying, the opportunity the witness had to see, hear, and know the things about which the witness testified, accuracy of memory, frankness or lack of it, intelligence, interest, or bias. *See Ohio Jury Instructions*, CV Section 305.05(3) (Rev. Aug. 15, 2012). Rather, the question of credibity here focuses on Taulbee's failure to follow the ORAM Manual instructions in conducting her assessment.

substitution of judgment by the reviewing court." *Parents Protecting Children* at ¶ 10. However, we must remember that " '[t]he legislature created the environmental protection agency consisting of a staff of experts to investigate alleged complaints, to conduct hearings on these complaints and to make determinations as to whether the laws in regard to air and water pollution and sewage disposal are being violated.' " *Burket v. N. Olmsted*, 8th Dist. No. 40605 (June 19, 1980), quoting *State ex rel. Brown v. Rockside Reclamation, Inc.*, 48 Ohio App.2d 157, 179-80 (8th Dist.1975). The administrative bodies were created by the General Assembly to facilitate certain areas of the law by placing the administration of those areas before members with special expertise, and, thus, we afford due deference to ERAC's interpretation of rules and regulations and resolution of evidentiary conflicts. *Harmony Environmental Ltd. v. Morrow Cty. Dist. Bd. of Health*, 10th Dist. No. 04AP-1338, 2005-Ohio-3146, ¶ 8; *Parents Protecting Children* at ¶ 10. ERAC only evaluates whether the Director's decision is lawful and reasonable, reasonable being that there is a valid factual foundation for his actions. R.C. 3745.05(F); *Citizens Commt.,* 56 Ohio App.2d at 70. Where there is supporting evidence in the record, there is a degree of deference for the Director's determination inherent in the reasonableness standard, and ERAC may not substitute its judgment for that of the Director. "However, at the same time, ERAC may not simply adopt the Director's judgment without reviewing and judging the evidence itself. Indeed, the reasonableness standard requires ERAC to consider whether the factual foundation that underlies the Director's action is 'valid.' In conducting this inquiry, ERAC must determine whether the evidence is of such quantity and quality that it provides a sound support for the Director's action. In other words, ERAC must engage in a limited weighing of the evidence." *Ohio Fresh Eggs, LLC, v. Wise*, 10th Dist. No. 07AP-780, 2008-Ohio-2423, ¶ 32. Nevertheless, "ERAC may not abuse its discretion in admitting evidence, weighing it, and granting credibility to testimony." *Citizens Against Am. Landfill Expansion v. Koncelik*, 10th Dist. No. 12AP-741 (Jan. 16, 2014), ¶ 14, citing *Tube City Olympic of Ohio, Inc. v. Jones,* 2004-Ohio-1464, at ¶ 26.

{¶ 50} As recognized in our recent case law, the Ohio EPA as an agency is comprised of experts; therefore, regardless of whether Ohio EPA staff are formally designated or qualified as experts, ERAC is entitled to afford some deference to them.

*Sierra Club v. Koncelik*, 10th Dist. No. 12AP-288, 2013-Ohio-2739, ¶ 50; *Natl. Wildlife Fedn. v. Korleski*, 10th Dist. No. 12AP-278, 2013-Ohio-3923, ¶ 57. This is not to say, however, that every staff witness of the Ohio EPA is considered an expert or is entitled to unquestioned deference. Furthermore, as noted above, even when a staff witness of the Ohio EPA is considered an expert or otherwise qualified, the reliability of his or her testimony must still be evaluated.

{¶ 51} Taulbee testified that the score of 61 that she gave to Wetland 71 was in the "gray zone." She indicated that a score of 65.5 is the breakpoint at which a wetland is categorized as a Category 3. Gara testified that a score of "35 to 59.5 is a Category 2 wetland. 60 to 64.5 is the gray zone between Category 2 and Category 3, and 65 or above is considered Category 3." (Tr. 1797.) Taulbee also testified that she did not find any threatened or endangered species, high quality forested wetland, old growth forested wetland, mature forest riparian wetland, vernal pools, bogs, or fens. She also admitted the habitable development was "not an excellent example of a wetland"; rather, it was "decent * * * good." (Tr. 1352.) The score of 66 that Taulbee gave to Wetland 72 was just one point higher than the breakpoint for Category 3.

{¶ 52} With respect to wetlands with a score between the scoring ranges for two categories, the ORAM Manual provides, as follows:

> Assuming the category has not been determined using the Narrative Rating, if the quantitative rating score is *between the scoring ranges* for Categories 1 and 2 or Categories 2 and 3, i.e. is in the "gray zone" between categories, the Rater can do either of the following:
>
> 1. Assign the wetland to the *higher* of the two categories * * *;
>
> 2. Assess the quality of the wetland using a nonrapid method, i.e. a detailed functional and/or biological assessment of the wetland and use this information in conjunction with any wetland indices of biotic integrity, the narrative criteria in OAC Rule 3745-1-54(C), etc., to assign the wetland to a category.

(Emphasis sic.) (ORAM Manual, 15.)

{¶ 53} It appears that Taulbee chose to assign Wetland 71 to the higher of the two categories, rather than conduct further assessment of the wetland. While this is permitted by the ORAM Manual, given the repeated instructions that it is very important to complete the Narrative Rating, we construe this instruction as presuming that a Narrative Rating has been conducted first and that such rating was indeterminative as to category. Furthermore, the ORAM Manual also states that, "[w]here ORAM scores fall at the 'break points' between wetland categories, for example, between Category 1 and 2, or 2 and 3, the ORAM score, by itself is not sensitive enough to distinguish between wetland type and other assessment techniques and professional judgment will need to be used in categorizing the wetland." (ORAM Manual, 1.) Consistent with this, Gara testified that "[o]ur recommendation is for people to use VIBI [Vegetative Index of Biotic Integrity] or some other detailed procedure if a score is agreed to as being in the gray zone between Category 1/Category 2 or Category 2/Category 3; and so in those instances, the score that's obtained using the VIBI procedure would be basically what breaks the tie or makes the final decision."[10] (Tr. 1801.) Taulbee conceded that the ORAM Manual states that the quantitative rating score has no intrinsic meaning that her understanding of the same is that such a score "in itself may not be the final end result, that there are other parameters to be considered." (Tr. 1616.) However, Taulbee did not present any evidence that she conducted other assessment techniques to categorize these wetlands, which fell at the "break point" between Category 2 and 3 and just above Category 3. Furthermore, while it could be argued that Taulbee employed her professional judgment to score the wetlands in addition to the quantitative rating form, because she did not complete the entire ORAM, as required by the ORAM Manual, we cannot find such judgment credible or reliable.

{¶ 54} Once again, we recognize our limited role and expertise to determine wetland categories. Indeed, courts have recognized on prior occasions the significant deference we must accord the Ohio EPA in making such determinations. In *Lightle v.*

---

[10] Taulbee testified that when she interned for the Ohio EPA in the early days of her studies and career, she would assist the wetland assessment staff in determining wetland categories by using the ORAM, the VIBI, and the Amphibian Index of Biotic Integrity ("AmphIBI"). There is no indication that she conducted either a VIBI or an AmphIBI when assessing Wetlands 71 or 72.

*Washington Court House*, 12th Dist. No. CA2006-08-033, 2007-Ohio-2069, the Twelfth District Court of Appeals stated, as follows:

> It is clear from these comprehensive regulatory schemes which create the [Ohio] EPA and the US EPA that these agencies have been designated the authority to regulate wetlands. Further, these agencies have been provided criteria to determine whether property is a wetland and what category of wetland it may be. Due to the specialization and authority granted to these agencies relating to wetlands and to maintain uniformity on the agency's policy, a proper designation can only be made by these agencies. The proper entity to designate property is the EPA, not a court.

*Id.* at ¶ 19. We further recognize, as ERAC did in its decision, that ERAC cannot substitute its judgment for the Director's when disputes over wetland classifications are factual in nature. Nevertheless, we must determine whether ERAC's order is supported by reliable, probative, and substantial evidence, and ERAC must determine whether the Director's decision has a valid factual foundation and, thus, is reasonable.

{¶ 55} The Supreme Court of Ohio has stated that, when considering the testimony of an expert who testifies about a subject beyond the knowledge of lay persons, the court must determine whether the expert's testimony "complied with the requirements of Evid.R. 702(C), *i.e.,* whether [her] opinion was *reliable.* In making this determination, our inquiry focuses on whether the principles and methods [the expert] employed to reach [her] opinion are *reliable*, not whether [her] conclusions are correct." (Emphasis added.) *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611 (1998), referring to the Staff Notes to Evid.R. 702. *Miller* followed the precedent set by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and noted "[t]o determine reliability, the *Daubert* court stated that a court must assess whether the reasoning or methodology underlying the testimony is scientifically *valid.*" (Emphasis added.) *Miller* citing *Daubert* at 592-93.

{¶ 56} Indeed, the rules of evidence, although not strictly applicable in ERAC proceedings, are instructive. The rules require courts, in assessing the admissibility of expert testimony, to determine whether process and methodology were properly followed:

A witness may testify as an expert if all of the following apply:

* * *

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) *The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.*

(Emphasis added.) Evid. R. 702.

{¶ 57} In affirming the Director, ERAC relied on Taulbee's ORAM quantitative rating score and testimony regarding the same. In order to affirm ERAC, we must find that evidence was reliable. The ORAM procedure is objectively verifiable from the ORAM Manual published by the Ohio EPA and developed by Ohio EPA staff and representatives from other government agencies, academia, and the private sector. We assume the ORAM Manual reliably implements the evaluation, as no party has argued otherwise. Nevertheless, because the ORAM Manual was not followed, we cannot say that the Ohio EPA's procedure was conducted in a way that will yield an accurate result. When the Ohio EPA does not follow its own methodology and instructions for accurately categorizing wetlands, we cannot say that the evidence is reliable. We also cannot say that the evidence was substantial, as the assessment was incomplete. Therefore, because ERAC did not have a valid factual foundation to affirm the Director, we find ERAC's determination is not supported by reliable and substantial evidence.

{¶ 58} The Director argues that Oxford has offered no explanation as to how its witnesses can be considered to have offered reliable, substantial, and probative evidence that the wetlands were Category 2 wetlands and that Oxford, as the permit applicant and

appellant, was the bearer of the burden of proof below. In so arguing, the Director attempts to turn our standard of review on its head. This court must examine whether ERAC's decision is supported by reliable, probative, and substantial evidence. ERAC relied on the quantitative rating scores and Taulbee's testimony regarding the same. Therefore, we have examined and considered whether that evidence is reliable, probative, and substantial. Had ERAC decided in favor of Oxford and, in so doing, relied on the evidence presented by Oxford, it would be our task to examine whether Oxford's evidence is reliable, probative, and substantial.[11]

{¶ 59} Accordingly, we sustain Oxford's second assignment of error.

## VII. Third Assignment of Error

{¶ 60} By its third assignment of error, Oxford contends that ERAC failed to properly determine, despite the improper classification of the wetlands, that impacts to the wetlands were justified because the project meets a demonstrated public need. Ohio Adm.Code 3745-1-54(D)(1)(c) provides that Category 3 wetlands shall not be impacted when the impact results in a lowering of the water quality unless the following factors are demonstrated: (1) there is no practical alternative, based on technical, social, and economic criteria; (2) appropriate and practical steps have been taken to minimize potential adverse impacts on the wetland ecosystem; (3) the proposed activity is necessary to meet a demonstrated public need; (4) the proposed activity is necessary to accommodate important social or economic development; (5) storm water and water quality controls will be installed; (6) the wetland is not scarce regionally or statewide; and (7) the designated use is replaced by a Category 3 wetland of equal or higher quality. Ohio Adm.Code 3745-1-50(II) defines "public need" as "an activity or project that provides important tangible and intangible gains to society, that satisfies the expressed or observed needs of the public where accrued benefits significantly outweigh reasonably foreseeable detriments."[12]

---

[11] We note that our reasoning in this decision would also apply with equal force to incomplete assessments performed by Section 401 Certification applicants, if ERAC relied on such evidence. Indeed, Oxford's own witness, Madej, testified that it was common practice to complete only the two-page quantitative scoring forms, rather than the entire ten-page ORAM form, "because the two page form is what generates the quantitative score which is essentially what tells you what the antidegradation category is." (Tr. 675-76.)

[12] As stated, there are several factors that the Director must evaluate before allowing impacts to Category 2 or Category 3 wetlands. To impact a Category 3 wetland, the Director must evaluate several factors in

{¶ 61} ERAC found that the Director acted lawfully and reasonably in considering public need because the Director's interpretation requiring a demonstration that this proposed action is the only available option to meet the public need is reasonable. Because we have sustained Oxford's first and second assignments of error, we need not consider this third assignment of error as it is moot.

{¶ 62} Accordingly, we render Oxford's third assignment of error moot.

## VIII. First Cross-Assignment of Error

{¶ 63} The Director also filed a notice of appeal and raised in his first cross-assignment of error the issue of whether ERAC has the authority to consider provisions in a Section 401 Certification when the lawfulness or reasonableness of those provisions was not raised as a ground for appeal before ERAC, pursuant to R.C. 3745.04. ERAC stated that Oxford did not raise in its notice of appeal the issue of whether the Director could address protection of endangered species since such protection is regulated by ODNR. However, ERAC did address the issue in its decision and found Part II.N, the section pertaining to wildlife protection, unlawful because it seeks to enforce a statutory and regulatory scheme outside the scope of the Director's statutory authority. The Director argues that Oxford did not raise the issue in its notice of appeal and that, therefore, ERAC's decision finding the wildlife protection unlawful must be reversed.

{¶ 64} In its notice of appeal to ERAC, Oxford raised six assignments of error, including:

> Assignment of Error No. 1
>
> The Terms and Conditions in the Oxford 401 Certification are Unreasonable and Unlawful Because Ohio EPA Considered Factors Beyond the Director's Authority
>
> Assignment of Error No. 5
>
> The Best Management Practices Required in the Oxford 401 Certification are Unreasonable.

---

addition to the factors for a Category 2. These additional factors include whether the wetland is scarce regionally or statewide and whether the applicant demonstrated a public need for the proposed activity. *See* Ohio Adm.Code 3745-1-54(D)(2) and (3). The only factor the parties addressed at the hearing in this case is whether Oxford demonstrated a public need.

Assignment of Error No. 6

It is Unreasonable to Prohibit Permanent In-Stream Ponds.

**{¶ 65}** The Director argues that, despite raising six "very detailed specific assignments of error," before ERAC, Oxford did not raise any objections to Part II.N of the Section 401 Certification and its conditions related to endangered species. (Director's brief, 7.) However, the Director acknowledges in his brief before this court that Oxford briefly argued the issue in its fifth and sixth assignments of error before ERAC.

**{¶ 66}** At issue is ERAC's review of the Section 401 Certification, which provided in Part II.N., as follows:

> (1) In the event that an eastern massasauga rattlesnake (*Sistrurus catenatus catenatus*) is encountered during construction of the project, work should immediately cease and the Ohio Department of Natural Resources, Division of Wildlife contacted. Caution should be employed during construction and during the snakes' active season (March 15-November 15).
>
> (2) If native musssels and/or mussel beds, not previously identified, are encountered at any time during construction or dredging activities, work must cease immediately and the Ohio Department of Natural Resources' Division of Wildlife contacted for further evaluation.

(Certified Record, 1.) Oxford contends that this issue was raised in its first assignment of error, through written discovery, during a deposition, in a pre-hearing brief, at the hearing, and in its post-hearing proposed findings of fact and conclusions of law.

**{¶ 67}** R.C. 3745.04(D) provides that "[a]n appeal shall be in writing and shall set forth the action complained of and the grounds upon which the appeal is based." Such "requirements and procedures set forth in R.C. 3745.04 are specific and use statutory language which is mandatory." *Franklin Cty. Regional Solid Waste Mgt. Auth. v. Schregardus*, 84 Ohio App.3d 591, 597 (10th Dist.1992).

**{¶ 68}** The Director's argument is similar to the one in *Natl. Wildlife Fedn.* where, on appeal to this court, appellants argued that the Director had failed to consider the factors set forth under Ohio Adm.Code 3745-1-05(C)(5)(d) and (f). The Director argued that appellants had waived this argument because, in their notice of appeal to ERAC,

appellants stated their assignment of error as " '[t]he factors the Director failed entirely or adequately to consider include, but are not limited to, the following: [wherein factors "a," "b," and "c" were stated].' " (Brackets sic.) *Natl. Wildlife Fedn.* at ¶ 32. This court found that the assignment of error put the Director on notice that the action complained of by appellants was that the Director failed to adequately consider the Ohio Adm.Code 3745-1-05(C)(5) factors. Thus, the assignment of error was sufficient for purposes of R.C. 3745.04(D).

{¶ 69} Whether the issue was raised in Oxford's fifth or sixth assignments of error or its first assignment of error in the notice of appeal to ERAC, the Director was put on notice as to the action complained of by Oxford—i.e., that the Director sought to enforce a statutory and regulatory scheme outside the scope of the Director's statutory authority. This, along with the raising of the issue in its pre-hearing brief, at the hearing, and in its post-hearing proposed findings of fact and conclusions of law, is sufficient for the purposes of R.C. 3745.04(D).

{¶ 70} Accordingly, the Director's first cross-assignment of error is overruled.

## IX. Second Cross-Assignment of Error

{¶ 71} By his second cross-assignment of error, the Director contends that ERAC erred in finding that the Director does not have the authority to include provisions related to water quality impacts upon endangered species in a Section 401 Certification.

{¶ 72} In its decision, ERAC held that, pursuant to *Patriot Water Treatment, LLC and City of Warren v. Korleski*, ERAC No. 156477 (July 3, 2012), the Director exceeded his authority by placing restrictions in the Section 401 Certification, in particular Part II.N referenced above, that were within ODNR's jurisdiction and attempted to expand the Director's statutory authority.

{¶ 73} In *Patriot Water*, ERAC found that the Director acted unlawfully and unreasonably by including a particular section in Patriot's National Pollutant Discharge Elimination System ("NPDES") Permit. The section Patriot challenged provided as follows:

> BB. Beginning on the effective date of this permit, the permittee shall stop accepting brine wastewater from oil or gas drilling, exploration or production. Disposal of brine wastewater from oil or gas drilling, exploration or production

through a wastewater treatment plant and discharge to waters of the state is not an authorized method of disposal under R.C. 1509.22(C)(1) unless and until it is approved by the Chief of the Division of Oil and Gas Resources Management for testing or implementing a new technology or method of disposal. If such an approval is granted under R.C. 1509.22(c)(1) by the Chief of the Division of Oil and Gas Resources Management, the permittee must submit an NPDES Permit Modification application to Ohio EPA for approval prior to acceptance of brine wastewater. The permittee may not accept brine wastewater from oil or gas drilling, exploration or production until after an NPDES Permit Modification authorizing acceptance of the material is approved.

{¶ 74} In *Patriot Water*, ERAC determined that the Director had no authority to enforce R.C. Chapter 1509 because it was within ODNR's jurisdiction. Specifically, ERAC determined that, because the provision imposed an affirmative obligation on the permittee and subjected the permittee to potential Ohio EPA enforcement actions, the provision constituted an affirmative prohibition of the acceptance of brine wastewater and, thus, constituted a substantive provision of the permit.

{¶ 75} ERAC further found in the *Patriot Water* decision that the Ohio Administrative Code did not authorize the Director to impose restrictions in NPDES permits beyond the scope of the Ohio EPA's regulatory authority. ERAC noted that, although Ohio Adm.Code 3745-33-07(A) "authorizes the Director to impose additional terms and conditions necessary to ensure compliance with 'applicable laws,' it is well-settled that an administrative agency's regulations cannot expand upon the statutory authority under which they are promulgated." *Patriot Water* at ¶ 151, citing *Odita v. Ohio Dept. of Human Serv.*, 88 Ohio App.3d 82 (10th Dist.1993). The Director's authority to impose terms and conditions necessary to ensure compliance with applicable laws was found to be limited to the laws and regulations that fall within the scope of R.C. Chapter 6111, or those laws that serve to protect water quality. Moreover, in *Patriot Water*, ERAC found that, pursuant to *Gen. Elec. Lighting v. Jones*, ERAC No. 185017 (Mar. 1, 2005), the

Director must be able to establish a valid factual foundation for the correlation between an operational restriction and the purpose of the restriction.[13]

{¶ 76} In the present case, the Director argues that R.C. 6111.30 requires an applicant to submit information regarding endangered species as part of all applications for water quality certifications. Therefore, the Director argues, he has the authority to consider such information when evaluating applications for water quality certifications. Ohio Adm.Code 3745-1-05 and 3745-1-54(B) and R.C. 6111.30 require the Director to consider impacts to aquatic life and wildlife when issuing Section 401 Certifications. The Director contends that Ohio Adm.Code 3745-32-05(C) authorizes him to impose conditions in water quality certifications that "are appropriate or necessary to ensure compliance with the applicable laws and to ensure adequate protection of water quality."

{¶ 77} Here, unlike in *Patriot Water*, the Director is imposing terms and conditions necessary to ensure compliance with regulations that fall within the scope of R.C. Chapter 6111. The antidegradation rule, Ohio Adm.Code 3745-1-05(C)(5), provides that, "[w]hen making determinations regarding proposed activities that lower water quality the director shall consider the following: * * * (b) The anticipated impact of the proposed lowering of water quality on aquatic life and wildlife, *including threatened and endangered species*, important commercial or recreational sport fish species. Other individual species and the overall aquatic community structure and function." (Emphasis added.) Ohio Adm.Code 3745-1-54(B)(4) provides that an applicant shall provide the Ohio EPA with written comments from both the ODNR and the United States Fish and Wildlife Service regarding threatened and endangered species and "[i]n making determinations regarding the lowering of water quality in wetlands which contain critical habitat for threatened and endangered species, or either the permanent or seasonal presence of a threatened or endangered species, the director shall consider the anticipated impact of the proposed lowering of water quality on the threatened or endangered species."

---

[13] The ERAC order in *Gen. Elec. Lighting v. Jones*, ERAC No. 185017 (Mar. 1, 2005), was appealed to this court, which affirmed in part and reversed in part. The restrictions were found to be substantive and, thus, prohibited by statute. This court also found that the ERAC finding that the restrictions did not assure compliance with applicable requirements was supported by the evidence. *Gen. Elec. Lighting v. Koncelik*, 10th Dist. No. 05AP-310, 2006-Ohio-1655.

{¶ 78} Ohio Adm.Code 3745-32-05(C) provides that "[t]he director may impose such terms and conditions as part of a section 401 water quality certification as are appropriate or necessary to ensure compliance with the applicable laws and to ensure adequate protection of water quality."  It is unreasonable to believe that the legislature would require an applicant to submit information regarding any impact an activity would have on endangered species and require the Director to consider such impacts when granting a Section 401 Certification if the Director did not have any power to impose reasonable restrictions to protect the endangered species.[14]  We find that ERAC erred in determining that the Director could not impose reasonable restrictions related to water quality impacts upon endangered species in a Section 401 Certification.

{¶ 79} Accordingly, the Director's second cross-assignment of error is sustained.

## X. Conclusion

{¶ 80} For the foregoing reasons, Oxford's first and second assignments of error are sustained, and Oxford's third assignment of error is rendered moot.  The Director's first cross-assignment of error is overruled, and his second cross-assignment of error is sustained.  Therefore, ERAC's order is affirmed in part and reversed in part.  This matter is remanded to ERAC to vacate that portion of its order affirming the Director's assessment of Wetlands 71 and 72 as Category 3 wetlands and the corresponding prohibition of impacts thereon.  ERAC shall make such other ruling regarding the same as is supported by reliable, probative, and substantial evidence or remand to the Director to make a decision which is reasonable and lawful consistent with this decision.  Furthermore, ERAC shall vacate that portion of its order finding that the Director exceeded his authority regarding Part II.N of the Certification and determining that the Ohio EPA does not have the authority to include provisions related to water quality impacts upon endangered species in a Section 401 Certification.

*Order affirmed in part and reversed in part;*
*cause remanded with instructions.*

KLATT and BRUNNER, JJ., concur.

_____

[14] We note as well that the Ohio EPA defers to ODNR regarding how to proceed if and/or when the endangered species are encountered by requiring Oxford to contact ODNR.