[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as
*Lafarge N. Am., Inc. v. Testa,* Slip Opinion No. 2018-Ohio-2047.]

NOTICE

This slip opinion is subject to formal revision before it is published in an
advance sheet of the Ohio Official Reports. Readers are requested to
promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65
South Front Street, Columbus, Ohio 43215, of any typographical or other
formal errors in the opinion, in order that corrections may be made before
the opinion is published.

SLIP OPINION NO. 2018-OHIO-2047

LAFARGE NORTH AMERICA, INC., APPELLANT, *v.* TESTA, TAX COMMR.,
APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it
may be cited as *Lafarge N. Am., Inc. v. Testa,* Slip Opinion No.
2018-Ohio-2047.]

*Use tax—Pelletized-slag manufacturer's breaking up and transport of solidified
slag are part of its "manufacturing operation" under R.C.
5739.02(B)(42)(g) such that use tax applies to its purchases of fuel and
repair parts for its equipment used primarily to break up and transport
slag—Board of Tax Appeals' decision reversed and cause remanded for it
to determine extent to which fuel and repair parts are used in slag
manufacturing for purposes of R.C. 5739.011(D) and to determine extent to
which penalty must be abated.*

(No. 2016-1074—Submitted April 10, 2018—Decided May 31, 2018.)

APPEAL from the Board of Tax Appeals, No. 2015-763.

_____

**Per Curiam.**

{¶ 1} This case involves slag, a by-product that separates from molten ore during steelmaking. Once separated from the ore, molten slag cools and solidifies into a stony substance. From there, it may be crushed into different sizes and used in construction applications, often as a base for roads.

{¶ 2} The Ohio operations of appellant, Lafarge North America, Inc., include manufacturing pelletized slag at a facility in Lordstown. At issue here is whether the Ohio use tax applies to Lafarge's purchases of fuel and repair parts for equipment used to break up and transport solidified slag from what the parties refer to as the "slag mountain," a large slag mass that numerous steel mills created over several decades. Whether the tax applies depends on whether the activity is part of Lafarge's "manufacturing operation" under R.C. 5739.02(B)(42)(g).

{¶ 3} After an audit, the Ohio Department of Taxation assessed the use tax, interest, and a penalty against Lafarge for purchases for the equipment in question. Lafarge challenged the assessment, and appellee, the tax commissioner, determined that the breaking up and transport of slag from the slag mountain *precedes* Lafarge's manufacturing operation. The commissioner concluded that Lafarge's manufacturing operation does not begin until the slag reaches equipment that screens and sorts it by size. The Board of Tax Appeals ("BTA") affirmed the commissioner's final determination.

{¶ 4} Lafarge appealed to this court. Because the BTA misapplied the law to the undisputed facts, we reverse the BTA's decision and remand the case to the BTA for further proceedings consistent with this opinion.

**Facts and Procedural History**

{¶ 5} In 1926, steel mills near Youngstown began dumping slag at a single waste site. Over the years, the discarded slag accumulated, forming the slag mountain. From this mass, Lafarge manufactures various sizes of pelletized slag, which it sells for use in road construction.

{¶ 6} Lafarge's manager of the Lordstown facility, Timothy Wirtz, explained in his testimony before the BTA that the slag mountain does not consist of "manageable size pieces" that can be easily removed for processing. So to transform the slag mountain into marketable slag, Lafarge undertakes three basic steps that involve (1) a bulldozer, (2) front-end loaders and dump trucks, and (3) a screening plant.

{¶ 7} The bulldozer, fitted with a large steel tooth at its rear, rips the slag in a grid pattern, breaking up a section of the slag mountain. The bulldozer then drives back and forth over the broken slag, crushing it into smaller pieces. Next, the bulldozer pushes the broken slag to a "surge pile." From there, front-end loaders transfer the slag to dump trucks that take the material to a screening plant, also at the Lordstown facility. There, the material is placed into a "grizzly" or "vibratory" feeder that separates oversized pieces, removes pieces of iron, and funnels the remaining slag to a conveyor belt that leads to screens that sort the material by size. Once the slag is screened and sorted, the process is finished and the product is ready to be sold. The finished product varies in size from as large as eight inches in diameter to as small as dust.

{¶ 8} The Department of Taxation audited all of Lafarge's Ohio operations, covering the period April 2009 through March 2013. As a result of the audit, the department assessed a use tax of $656,871.14, plus a 15 percent penalty of $98,530.28 and interest totaling $59,895.12. Lafarge paid a substantial portion of these amounts ($698,979.15 in total) but challenged the assessment, interest, and penalty associated with its Lordstown slag-manufacturing operation. The department had found that the bulldozer, two front-end loaders, and three dump trucks Lafarge uses to remove slag from the slag mountain and transport it to the screening plant are not part of the manufacturing operation and that purchases of fuel and repair parts for that equipment are therefore taxable. Lafarge disagreed,

claiming that under R.C. 5739.02(B)(42)(g), the use tax does not apply because the equipment is used to manufacture slag.

{¶ 9} The tax commissioner denied Lafarge's objection, finding that the "items at issue are used to excavate slag from the slag pile prior to the start of the manufacturing process. This is analogous to a manufacturer removing a raw material from initial storage. Equipment used to move raw materials prior to the start of the manufacturing process is taxable." The commissioner also denied Lafarge's request for abatement of the penalty.

{¶ 10} Lafarge appealed to the BTA, which found that "the cutting and crushing of the slag, and the slag's transport to the mill, are not part of the manufacturing process." BTA No. 2015-763, 2016 WL 3469366, *4 (June 21, 2016). Continuing, the BTA stated that "Lafarge is simply moving raw material from a pre-production point of storage, not 'continuing' a manufacturing operation. * * * We agree with the commissioner that the time at which the slag is committed to 'processing,' and manufacturing begins, is * * * when the slag pieces arrive at the mill." *Id.* The BTA thus affirmed the tax assessment and the penalty.

{¶ 11} Lafarge appealed to this court as a matter of right.

**Analysis**

*When the manufacturing operation begins*

{¶ 12} Ohio's use tax does not apply to the purchase of an item intended for use "primarily in a manufacturing operation to produce tangible personal property for sale." R.C. 5739.02(B)(42)(g); *see also* R.C. 5741.02(C)(2). The tax commissioner concedes that Lafarge's production of pelletized slag is a manufacturing operation within the meaning of R.C. 5739.02(B)(42)(g), but he rejects Lafarge's argument as to when its manufacturing operation begins. He says that Lafarge's activities at the slag mountain involve merely the excavation and transportation of raw material from storage and that Lafarge's manufacturing operation does not begin until the slag reaches the screening plant. Lafarge

4

disagrees, emphasizing that it breaks up the slag to marketable sizes almost entirely at the slag mountain—before the slag reaches the screening plant.

{¶ 13} We must determine whether the BTA's decision is "reasonable and lawful." R.C. 5717.04. In doing so, we must defer to the BTA's factual findings, so long as they are supported by " 'reliable and probative' " evidence in the record. *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, quoting *Am. Natl. Can Co. v. Tracy*, 72 Ohio St.3d 150, 152, 648 N.E.2d 483 (1995). But we must review legal issues de novo. *Crown Communication, Inc. v. Testa*, 136 Ohio St.3d 209, 2013-Ohio-3126, 992 N.E.2d 1135, ¶ 16. Because the issue presented involves an application of the law to largely undisputed facts, we review the issue de novo. *Cincinnati v. Testa*, 143 Ohio St.3d 371, 2015-Ohio-1775, 38 N.E.3d 847, ¶ 15.

{¶ 14} The use tax does not apply to a purchase when "the purpose of the purchaser is * * * [t]o use the thing transferred, as described in [R.C.] 5739.011 * * *, primarily in a manufacturing operation to produce tangible personal property for sale." R.C. 5739.02(B)(42)(g). The tax commissioner does not dispute that "thing transferred" includes fuel and repair parts for equipment used in a manufacturing operation. *See* R.C. 5739.011(B)(1), (2), and (11); Ohio Adm.Code 5703-9-21(C)(5). "Manufacturing operation" is defined in R.C. 5739.01(S) and Ohio Adm.Code 5703-9-21(B)(1).

{¶ 15} R.C. 5739.01(S) defines "manufacturing operation" as "a process in which materials are changed, converted, or transformed into a different state or form from which they previously existed and includes refining materials, assembling parts, and preparing raw materials and parts by mixing, measuring, blending, or otherwise committing such materials or parts to the manufacturing process." The operative language of this definition is its first clause—"a process in which materials are changed, converted, or transformed into a different state or form from which they previously existed." The second clause, which lists activities

"include[d]" within the primary definition, merely illustrates types of actions that constitute a manufacturing operation. *See Trans Rail Am., Inc. v. Enyeart*, 123 Ohio St.3d 1, 2009-Ohio-3624, 913 N.E.2d 948, ¶ 28.

{¶ 16} After repeating the language of R.C. 5739.01(S), Ohio Adm.Code 5703-9-21(B)(1) further defines when a manufacturing operation begins:

> The manufacturing operation begins when the raw materials or parts are committed to the manufacturing process. If the raw materials or parts are stored after being received at the manufacturing facility, the raw materials or parts are not committed until after they are removed from such initial storage. The point of commitment is where the materials handling from such initial storage has ceased or the point where the materials or parts have been mixed, measured, blended, heated, cleaned, or otherwise treated or prepared for the manufacturing process, whichever first occurs. If the raw materials or parts are not stored, they are committed at the point where materials handling from the place of receipt ceases or where they are mixed, measured, blended, heated, cleaned, or otherwise treated or prepared for the manufacturing process, whichever first occurs. The commitment of the materials or parts need not be irrevocable, but they must have reached the point, after materials handling from initial storage has ceased, where they normally will be utilized within a short period of time. The point of commitment frequently will be different for particular materials and parts, since they are introduced at different times in the manufacturing operation.
>
> Things used in any activity, including movement or storage of the materials of parts before they are committed are taxable.

Here, the operative language is: "The manufacturing operation begins when the raw materials or parts are committed to the manufacturing process." What follows that sentence is conditional; whether the text following that sentence is applicable to a manufacturing operation depends on the nature of the operation and whether the material is "stored after being received."

{¶ 17} Thus, to determine whether Lafarge's Lordstown slag-manufacturing operation begins at the slag mountain, we must answer two questions: When is the slag "changed, converted, or transformed into a different state or form from which [it] previously existed"? And when is the slag "committed to the manufacturing process"?

{¶ 18} To answer these questions, it is important to understand that the object of Lafarge's manufacturing operation is to reduce the slag mountain to smaller, marketable pieces of slag. To get there, Lafarge simply breaks up the material and crushes it. Its process never involves mixing or blending in other materials, adding chemicals, heating, cooling, or otherwise treating the slag.

{¶ 19} The BTA found that "the cutting and crushing of the slag, and the slag's transport to the mill [i.e., the screening plant], are not part of the manufacturing process." 2016 WL 3469366 at *4. It characterized Lafarge's activity before the slag arrives at the screening plant as "simply moving raw material from a pre-production point of storage, not 'continuing' a manufacturing operation." *Id.* In defense of these findings, the tax commissioner points to evidence showing that Lafarge's activity at the slag mountain facilitates transportation of the slag to the screening plant. He emphasizes Wirtz's testimony that the bulldozer breaks up the slag "a little bit" into "manageable size pieces" that can be picked up by a front-end loader. Wirtz also characterized the slag mountain as "a storage pile." This evidence, the tax commissioner argues, shows that Lafarge

uses the equipment at issue only to transport raw material to the actual manufacturing operation.

**{¶ 20}** But when viewed as a whole, the evidence shows that the equipment is not merely facilitating the transportation of slag from "initial storage" to the screening plant. It is undisputed that after separating slag from the mountain, the bulldozer drives over it, crushing it in the process. To be sure, this action allows the front-end loaders to pick up the slag for transport, but the evidence does not support the conclusion that that is the bulldozer's *only* purpose.

**{¶ 21}** No evidence shows that the slag undergoes any significant transformation in form once it reaches the screening plant. To the contrary, Wirtz explained that the slag has "already been broken up" by the time the bulldozer has pushed it into a surge pile. When the slag reaches the screening plant, the vibratory feeder removes slag pieces that are "still too oversized to fit through the mill," and then it is mostly just a matter of sorting by size.

**{¶ 22}** The undisputed evidence shows that once it arrives at the screening plant, the slag does not undergo any additional material "change[], conver[sion], or transform[ation] into a different state or form from which [it] previously existed," R.C. 5739.01(S). That is because the real change has already taken place at the slag mountain. It follows that the act of cutting slag from the mountain "commit[s] [the material] to the manufacturing process," Ohio Adm.Code 5703-9-21(B)(1). Once it has begun, the manufacturing operation continues until Lafarge has completed its manufacture of pelletized slag. *See* R.C. 5739.011(A)(6) (defining "continuous manufacturing operation" as "the process in which raw materials or components are moved through the steps whereby manufacturing occurs"). Therefore, the manufacturing operation begins once Lafarge cuts slag from the mountain, and the manufacturing operation continues as the bulldozer crushes the material, the front-end loaders place it in dump trucks, and the trucks transport it to the screening plant.

{¶ 23} The only remaining question is whether the fuel and repair parts Lafarge purchased for the equipment at issue are used "primarily" in Lafarge's manufacturing operation. *See* R.C. 5739.02(B)(42)(g). Regarding the primary-use question, R.C. 5739.011(D) provides that

> if the "thing transferred" is a machine used by a manufacturer in both a taxable and an exempt manner, it shall be totally taxable or totally exempt from taxation based upon its quantified primary use. If the "things transferred" are fungibles, they shall be taxed based upon the proportion of the fungibles used in a taxable manner.

{¶ 24} The main issue here is the extent to which the fuel and repair parts are used in slag manufacturing, as opposed to a landfill operation that Lafarge also operates at the same site. On remand, with the guidance of R.C. 5739.011(D), the BTA shall determine on the existing record the extent to which the use tax applies to the fuel and repair-part purchases that Lafarge made for the six pieces of equipment it uses for slag manufacturing at its Lordstown facility.

*The penalty*

{¶ 25} Lafarge also argues that we should abate the 15 percent penalty imposed by the Department of Taxation. Lafarge will not owe penalty attributable to any portion of the tax that was erroneously assessed. Therefore, on remand, the BTA also shall determine the extent to which the previously assessed penalty must be abated.

**Conclusion**

{¶ 26} For the foregoing reasons, we reverse the BTA's decision and remand the case to the BTA for further proceedings consistent with this opinion.

Decision reversed

and cause remanded.

O'CONNOR, C.J., and O'DONNELL, KENNEDY, FRENCH, FISCHER, DEWINE, and DEGENARO, JJ., concur.

_____

Bingham Greenebaum Doll, L.L.P., and Mark A. Loyd, for appellant.

Michael DeWine, Attorney General, and Daniel G. Kim and Raina Nahra Boulos, Assistant Attorneys General, for appellee.

_____