[Cite as *Stingray Pressure Pumping L.L.C. v. Tax Commr. of Ohio*, 2019-Ohio-5198.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Stingray Pressure Pumping LLC, | : | |
| | | No. 18AP-110 |
| Appellant-Appellant, | : | (B.T.A. No. 2015-1465) |
| | | & |
| v. | : | No. 18AP-111 |
| | | (B.T.A. No. 2015-1823) |
| [Jeffrey A. McClain], | : | |
| Tax Commissioner of Ohio, | | (REGULAR CALENDAR) |
| | : | |
| Appellee-Appellee. | | |
| | : | |

D E C I S I O N

Rendered on December 17, 2019

**On brief:** *Baker & Hosteller LLP,* and *Edward J. Bernert,* for appellant. **Argued:** *Edward J. Bernert.*

**On brief:** [*Dave Yost*], Attorney General, and *Daniel G. Kim,* for appellee. **Argued:** *Daniel G. Kim.*

APPEALS from the Ohio Board of Tax Appeals

KLATT, P. J.

{¶ 1} Stingray Pressure Pumping LLC ("Stingray"), appeals from the decision of the Ohio Board of Tax Appeals ("the BTA") entered on January 17, 2018. The BTA's decision affirmed two final determinations of the Tax Commissioner of Ohio ("tax commissioner") that assessed tax liability related to Stingray's purchases of certain equipment it uses in its hydraulic fracturing operations. Because subsequent to the BTA's decision an amendment to R.C. 5739.02(B)(42) became effective that retroactively applies to the tax exemption at issue here, and because the BTA abused its discretion in refusing to abate penalties for tax assessments that were later canceled, we reverse the BTA's decision and remand for further consideration.

No. 18AP-110 and 18AP-111

## I.     FACTS AND PROCEDURAL BACKGROUND

{¶ 2}   The central issue in this appeal is whether an exemption to the excise ("sales") tax applies to certain pieces of equipment purchased and used by Stingray in the production of crude oil and natural gas by a process known as hydraulic fracturing.  To understand the context in which this issue arises, we start with a general description of hydraulic fracturing. Hydraulic fracturing is the process of inserting water, chemicals, and sand under high pressure through perforations in a casing that lines a well hole, to create fractures or cracks in shale formations to allow the extraction of oil and gas held in the formation.  The size of the fractures is increased by the force of the hydraulic mixture delivered under pressure. The hydraulic mixture contains water, chemicals, cross link fluid (slick water with some friction reducer) and sand, called proppant, which holds the fractures open to allow the oil and gas to flow through them.

{¶ 3}   The appropriate amount of pressure and the mixture of water, sand, and chemicals is highly dependent on the geological conditions in the well.  In some cases, the well will not accommodate the pressure necessary to deliver the large quantities of necessary sand.  Gel made from guar and other materials is added when necessary to increase viscosity for pumping when a lower pressure is required.  Guar acts as a suspending agent that holds the sand in place in the fractures.  The decisions regarding what additives, and in what quantities, to mix into the fracturing fluid are made quickly while preparing the fluid and injecting it into the well.

{¶ 4}   Stingray is engaged in the production of crude oil and natural gas from shale formations by hydraulic fracturing.  Stingray begins its hydraulic fracturing process after a separate company digs a well and inserts a metal casing.  The casing is cemented in place in the well to ensure that it is held in place.  A perforating company shoots holes in the casing and creates a connection with the shale formation.  These holes are similar to doors that permit hydraulic fluid to flow.  Only after the well is drilled, the casing is inserted and cemented, and the production casing is perforated, does Stingray begin its hydraulic fracturing production process.

{¶ 5}   The hydraulic fracturing production process involves numerous pieces of equipment. Stingray purchased data van command posts, pumps, high pressure manifolds, blenders, sand kings and sand silos, t-belts, hydration units, and related equipment for its

No. 18AP-110 and 18AP-111

hydraulic fracturing operation. Each piece of equipment is permanently mounted on a trailer and must be titled as a motor vehicle. Stingray believed that these equipment purchases were not subject to sales tax under an exemption contained in former R.C. 5739.02(B)(42)(a). Stingray paid no sales tax at the time of the motor vehicle transfers but supplied instead exemption certificates claiming "direct use – oil and gas." (Commissioner Final Determination July 17, 2015 at 2.)[1]

{¶ 6} The tax commissioner initially issued 60 assessments for sales tax liability against Stingray. Each assessment corresponded to a piece of equipment Stingray purchased for its hydraulic fracturing operation that the tax commissioner deemed subject to the sales tax. Stingray disputed the assessments and filed petitions for reassessments with the tax commissioner. Stingray argued that the equipment at issue was exempt under former R.C. 5739.02(B)(42)(a) because the equipment was used directly in the production of crude oil and natural gas. The tax commissioner decided Stingray's requests for reassessments in two final determinations dated July 17 and August 24, 2015.[2] The tax commissioner canceled 33 assessments based on his determination that certain pieces of equipment qualified for an exemption under former R.C. 5739.02(B)(42)(a). However, the tax commissioner left intact the monetary penalties associated with the initial assessments. The tax commissioner affirmed the remaining 23 tax assessments based on his determination that they related to equipment not directly used in the production of crude oil and natural gas, and therefore, did not qualify for the exemption under former R.C. 5739.02(B)(42)(a).[3]

{¶ 7} The tax commissioner's decisions were based on former R.C. 5739.02(B)(42)(a), which provided:

---

[1] Pursuant to R.C. 5739.02, an excise ("sales") tax is levied upon all retail sales made in Ohio. By virtue of R.C. 5741.02, a corresponding tax is imposed on the storage, use, or consumption in this state of any tangible personal property. The legislature has also provided numerous exceptions and exemptions to the collection of sales tax, and, through R.C. 5741.02(C)(2), has mandated that if acquisition of an item within the state would not be subject to tax, then the item's use within the state is correspondingly not subject to tax. (Jan. 17, 2018 Decision & Entry at 2.)

[2] The commissioner's July 17, 2015 final determination addressed 29 assessments comprising $1,788,864.58 in tax, interest, and penalty; and the August 24, 2015 final determination addressed 31 assessments comprising $1,840,055.53 in tax, interest, and penalty.

[3] Stingray did not timely appeal the assessments of four other pieces of equipment.

No. 18AP-110 and 18AP-111

> For the purpose of providing revenue with which to meet the needs of the state, for the use of the general revenue fund of the state, for the purpose of securing a thorough and efficient system of common schools throughout the state, for the purpose of affording revenues, in addition to those from general property taxes, permitted under constitutional limitations, and from other sources, for the support of local governmental functions, and for the purpose of reimbursing the state for the expense of administering this chapter, an excise tax is hereby levied on each retail sale made in this state.
>
> * * *
>
> (B)  The tax does not apply to the following:
>
> * * *
>
> (42)  Sales where the purpose of the purchaser is to do any of the following:
>
> (a)  To incorporate the thing transferred as a material or part into tangible personal property to be produced for sale by manufacturing, assembling, processing, or refining; *or to use or consume the thing transferred directly in producing tangible personal property for sale by mining, including without limitation*, the extraction from the earth of all substances that are classed geologically as minerals, *production of crude oil and natural gas*, or directly in the rendition of a public utility service, except that the sales tax levied by this section shall be collected upon all meals, drinks, and food for human consumption sold when transporting persons. Persons engaged in rendering services in the exploration for, and production of, crude oil and natural gas for others are deemed engaged directly in the exploration for and production of, crude oil and natural gas.  This paragraph does not exempt from "retail sale" or "sales at retail" the sale of tangible personal property that is to be incorporated into a structure or improvement to real property.

(Emphasis added.)

{¶ 8}  Stingray appealed the tax commissioner's final determinations to the BTA arguing that the 23 pieces of equipment deemed by the tax commissioner to be taxable "work together in unison to [produce oil and gas] and cannot be separated from the production process," and therefore, should be exempt.  (Feb. 14, 2018 Stingray's 2015-1465 Notice of Appeal at 4.)  Stingray also appealed the penalties associated with the assessments

No. 18AP-110 and 18AP-111

that were canceled along with the 23 assessments that remained in place. The BTA consolidated the appeals for hearing and decision purposes.

{¶ 9} On April 3, 2017, the BTA's attorney examiner conducted a combined hearing on both final determinations. Based upon the record of that hearing, the BTA issued its decision and order affirming the tax commissioner's final determinations (BTA Case Nos. 2015-1465 and 2015-1823 entered January 17, 2018). The BTA found that the contested pieces of equipment used to blend the hydraulic fluid and control the overall process are not exempt from sales tax because these pieces of equipment are not used directly in the production of crude oil and natural gas. The BTA based its decision on its interpretation of the exemption language contained in former R.C. 5739.02(B)(42)(a) ("to use * * * the thing transferred directly in producing tangible personal property for sale by mining, including without limitation * * * production of crude oil and natural gas") and on case law interpreting the scope of that exemption. The BTA principally relied on its prior decision in *Indep. Frac Serv. v. Limbach*, No. 1989-J-863 (June 28, 1991) and on *Lyons v. Limbach*, 40 Ohio St.3d 92 (1988) (tax assessments upheld for land reclamation equipment and "frac tanks" that store water at the well site because they were not used directly in the exploration for, or production of, crude oil and natural gas) and *Kilbarger Constr., Inc. v. Limbach*, 37 Ohio St.3d 234 (1988) (tax assessments upheld for equipment used to prepare a site for drilling oil and gas wells because they were not used directly in exploration for or production of oil and gas). The BTA stated:

> We find our decision in *Independent Frac Service* dispositive as to the blenders and the equipment which feeds material to it, i.e., the sand kings/silos and t-belts, chemical add, and hydration unit. Stingray fails to demonstrate how the facts of the process used in these matters are distinguishable from the process at issue in *Independent Frac Service*. Stingray argues that, because the well had not yet been drilled in *Independent Frac Service*, this board's conclusion was foregone under the case law holding that the actual drilling of the well is the first point at which the mining equipment could possibly be exempt. See *Kilbarger,* supra. However, we reject such conclusion and agree with the Tax Commissioner that [the] focus of the inquiry is the actual usage of the equipment and not merely the sequence of events. 2016-1465 S.T. at 4. We further agree with the commissioner's conclusion that, just as with the blenders in *Independent Frac Service*, the equipment at issue in these matters are adjuncts to the drilling process. See *Lyons,* supra.

> In doing so, we reject Stingray's contention that these matters should be analyzed in a matter more similar to the analysis used in applying the manufacturing exemption. See id. at 95.

(BTA Decision and Order at 3.)

{¶ 10} The BTA also denied Stingray's request that the assessed penalties be abated, stating:

> Finally, we find that Stingray has failed to meet its burden with regard to abatement of the assessed penalties. Although it requested abatement in its notices of appeal, it has presented no further argument in support. In consideration of whether the assessed penalties should have been abated, we look to the Supreme Court's decision in *Jennings & Churella Constr. Co. v. Lindley*, 10 Ohio St.3d 67 (1984), where it held that "[r]emission of the penalty is discretionary. * * * Appellate review of this discretionary power is limited to a determination of whether an abuse has occurred." Id. at 70. Further, in *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83 (1985), the court held " ' "In order to have an 'abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias. * * *" ' *State v. Jenkins* (1984), 15 Ohio St.3d 1674, 222." Id. at 87. See also *J.M. Smucker, L.L.C. v. Levin*, 113 Ohio St.3d 337, 2007-Ohio-2073, ¶ 16. Here, upon review of the record, we conclude there is no evidence that the commissioner abused his discretion with regard to the amount of the penalties assessed.

*Id.* at 3-4.

{¶ 11} Stingray appeals the decision of the BTA affirming the tax commissioner's final determinations. However, subsequent to the filing of this appeal, the General Assembly amended R.C. 5739.02(B)(42), expressly as a remedial measure, to clarify the tax exemption at issue here. Because this amendment did not become effective until after the BTA issued its decision and order, the BTA did not apply the amended statute in rendering its determinations.

## II.    ASSIGNMENTS OF ERROR

{¶ 12} Stingray presents two assignments of error for our review:

> [1.] The Board of Tax Appeals erred in affirming the decision of the Ohio Tax Commissioner by agreeing with the Tax

Commissioner that certain hydraulic fracturing equipment does not qualify for exemption from Ohio's sales and use tax under R.C. 5739.02(B)(42)(a).

[2.] The Board of Tax Appeals erred in refusing to eliminate the penalty for the equipment that qualifies for exemption from Ohio's sales and use tax under R.C. 5739.02(B)(42)(a).

## III. LEGAL ANALYSIS

### A. Standard of Review

{¶ 13} An appellate court reviews a BTA's decision to determine whether it is "reasonable and lawful." R.C. 5717.04; *NWD 300 Spring, L.L.C. v. Franklin Cty. Bd. of Revision*, 151 Ohio St.3d 193, 2017-Ohio-7579. ¶ 13. "[I]f it is both, we must affirm." *Id.* "It is well-settled that [an appellate] court will defer to factual determinations of the BTA if the record contains reliable and probative support for them." *Strongsville Bd. of Edn. v. Wilkins*, 108 Ohio St.3d 115, 2006-Ohio-248, ¶ 7.

{¶ 14} The facts in this appeal are largely undisputed. However, the parties disputed the proper construction and application of the exemptions to Ohio's sales tax set forth in former R.C. 5739.02(B)(42)(a). An issue involving an application of the law to largely undisputed facts is reviewed de novo. *Equity Dublin Assocs. v. Testa*, 142 Ohio St.3d 152, 2014-Ohio-5243, ¶ 22; *Lafarge N. Am., Inc. v. Testa*, 153 Ohio St.3d 245, 2018-Ohio-2047, ¶ 13. Accordingly, we review the legal issues presented in this matter de novo.

### B. Assignments of Errors

#### 1. First Assignment of Error

{¶ 15} By its first assignment of error, Stingray contends that the BTA erred in affirming the decision of the tax commissioner because the 23 pieces of hydraulic fracturing equipment at issue qualify for exemption from Ohio's sales tax under former R.C. 5739.02(B)(42)(a). Because the General Assembly amended R.C. 5739.02(B)(42) to modify the language governing the sales tax exemption for certain kinds of property used in the production of crude oil and natural gas, we begin our analysis by determining whether the amended statute applies to this case. At the court's request, the parties provided supplemental briefing on this question. Although they interpret the amended statute differently, both Stingray and the BTA argue that the amended statute applies to this case. We agree.

{¶ 16} R.C. 5739.02(B)(42) was amended, effective September 13, 2018, by 2017 H.B. No. 430, Section 3.[4]  R.C. 5739.02(B)(42)(q) was added to clarify the direct use exemption previously contained in R.C. 5739.02(B)(42)(a).  It provides:

> For the purpose of providing revenue with which to meet the needs of the state, for the use of the general revenue fund of the state, for the purpose of securing a thorough and efficient system of common schools throughout the state, for the purpose of affording revenues, in addition to those from general property taxes, permitted under constitutional limitations, and from other sources, for the support of local governmental functions, and for the purpose of reimbursing the state for the expense of administering this chapter, an excise tax is hereby levied on each retail sale made in this state.
>
> * * *
>
> (B) The tax does not apply to the following:
>
> * * *
>
> (42) Sales where the purpose of the purchaser is to do any of the following:
>
> * * *
>
> (q) To use or consume the thing transferred directly in production of crude oil and natural gas for sale. Persons engaged in rendering production services for others are deemed engaged in production.
>
> As used in division (B)(42)(q) of this section, "production" means operations and tangible personal property directly used to expose and evaluate an underground reservoir that may contain hydrocarbon resources, prepare the wellbore for production, and lift and control all substances yielded by the reservoir to the surface of the earth.
>
> (i) For the purposes of division (B)(42)(q) of this section, the "thing transferred" includes, but is not limited to, any of the following:
>
> (I) Services provided in the construction of permanent access roads, services provided in the construction of the well site, and

---

[4] R.C. 5739.02 was amended two more times, effective March 20, and July 22, 2019, but no changes were made to R.C. 5729.02(B)(42)(q).

services provided in the construction of temporary impoundments;

(II) Equipment and rigging used for the specific purpose of creating with integrity a wellbore pathway to underground reservoirs;

(III) Drilling and workover services used to work within a subsurface wellbore, and tangible personal property directly used in providing such services;

(IV) Casing, tubulars, and float and centralizing equipment;

(V) Trailers to which production equipment is attached;

(VI) Well completion services, including cementing of casing, and tangible personal property directly used in providing such services;

(VII) Wireline evaluation, mud logging, and perforation services, and tangible personal property directly used in providing such services;

(VIII) Reservoir stimulation, hydraulic fracturing, and acidizing services, and tangible personal property directly used in providing such services, including all material pumped downhole;

(IX) Pressure pumping equipment;

(X) Artificial lift systems equipment;

(XI) Wellhead equipment and well site equipment used to separate, stabilize, and control hydrocarbon phases and produced water;

(XII) Tangible personal property directly used to control production equipment.

(ii) For the purposes of division (B)(42)(q) of this section, the "thing transferred" does not include any of the following:

(I) Tangible personal property used primarily in the exploration and production of any mineral resource regulated under Chapter 1509. of the Revised Code other than oil or gas;

(II) Tangible personal property used primarily in storing, holding, or delivering solutions or chemicals used in well stimulation as defined in section 1509.01 of the Revised Code;

(III) Tangible personal property used primarily in preparing, installing, or reclaiming foundations for drilling or pumping equipment or well stimulation material tanks;

(IV) Tangible personal property used primarily in transporting, delivering, or removing equipment to or from the well site or storing such equipment before its use at the well site;

(V) Tangible personal property used primarily in gathering operations occurring off the well site, including gathering pipelines transporting hydrocarbon gas or liquids away from a crude oil or natural gas production facility;

(VI) Tangible personal property that is to be incorporated into a structure or improvement to real property;

(VII) Well site fencing, lighting, or security systems;

(VIII) Communication devices or services;

(IX) Office supplies;

(X) Trailers used as offices or lodging;

(XI) Motor vehicles of any kind;

(XII) Tangible personal property used primarily for the storage of drilling byproducts and fuel not used for production;

(XIII) Tangible personal property used primarily as a safety device;

(XIV) Data collection or monitoring devices;

(XV) Access ladders, stairs, or platforms attached to storage tanks.

The enumeration of tangible personal property in division (B)(42)(q)(ii) of this section is not intended to be exhaustive, and any tangible personal property not so enumerated shall not necessarily be construed to be a "thing transferred" for the purposes of division (B)(42)(q) of this section.

The commissioner shall adopt and promulgate rules under sections 119.01 to 119.13 of the Revised Code that the commissioner deems necessary to administer division (B)(42)(q) of this section.

No. 18AP-110 and 18AP-111

> As used in division (B)(42) of this section, "thing" includes all transactions included in divisions (B)(3)(a), (b), and (e) of section 5739.01 of the Revised Code.

{¶ 17} Under R.C. 1.48, legislation and amendments to previously enacted legislation are presumed to be prospective unless the General Assembly expressly makes it retrospective. *See* R.C. 1.48; *Heyman v. Heyman*, 10th Dist. No. 05AP-475, 2006-Ohio-1345, ¶ 9. In this case, 2017 H.B. No. 430, Section 3, specifically expresses that "[t]he amendment by this act to sections * * * 5739.02 of the Revised Code is a remedial measure intended to clarify existing law and applies to all cases pending on a petition for reassessment or further appeal, or transactions subject to an audit by the Department of Taxation, on or after, May 18, 2018." Therefore, the General Assembly has expressed a clear intent to have the amended statute apply retroactively to those matters still on appeal. This case involves "further appeal" from petitions for reassessment filed by appellant and was pending on May 18, 2018.[5]

{¶ 18} When the legislature manifests its intent to have a statute or statutory amendment applied retrospectively, the constitutional protections afforded in Ohio Constitution, Article II, Section 28, are implicated. That section provides, as follows:

> The general assembly shall have no power to pass retroactive laws, or laws impairing the obligation of contracts; but may, by general laws, authorize courts to carry into effect, upon such terms as shall be just and equitable, the manifest intention of parties, and officers by curing omissions, defects, and errors, in instruments and proceedings, arising out of their want of conformity with the laws of this state.

{¶ 19} Ohio courts have interpreted this constitutional provision to prohibit the retroactive application of laws that are substantive in nature only, but laws of a remedial nature are permitted to be retrospective. *Heyman* at ¶ 10. Moreover, statutes are presumed to be constitutional. *Mahoning Edn. Assn. of Dev. Disabilities v. State Emp. Relations Bd.*, 137 Ohio St.3d 257, 260. " 'An enactment of the General Assembly is presumed to be constitutional, and before a court may declare it unconstitutional it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly

---

[5] R.C. 5739.02 Editor's Note acknowledges Section 3, 2017 H.B. No. 430.

incompatible.' " *Id.*, quoting *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142 (1955), paragraph one of the syllabus.

{¶ 20} In this case, we find that applying the amended statute retroactively does not offend constitutional principles. The amendment clarifies the preexisting exemption from sales tax for equipment used directly in the production of crude oil and natural gas. The exemption was available before and after the amendment. H.B. No. 430 clarifies the scope of the direct use exemption for equipment used in the production of crude oil and natural gas. Thus, we find that the statutory amendment applies to this case.

{¶ 21} Amended R.C. 5739.02(B) provides that the sales tax does not apply to: (42) sales where the purpose of the purchaser is to (q) use or consume the "thing transferred" directly in the production of crude oil and natural gas for sale. "Production" is defined in R.C. 5739.02(B)(42)(q) as operations and tangible property directly used to (1) expose and evaluate an underground reservoir that may contain hydrocarbon resources, (2) prepare the wellbore for production, and (3) lift and control all substances yielded by the reservoir to the surface of the earth.

{¶ 22} The amended statute further provides a non-exhaustive list of services, equipment, and items that qualify as a "thing transferred." R.C. 5739.02(B)(42)(q)(i). Potentially relevant to the equipment at issue here are provisions: "VIII" ("Reservoir stimulation, hydraulic fracturing, and acidizing services, and tangible personal property directly used in providing such services, including all material pumped downhole"), "IX" ("Pressure pumping equipment"), and "V" ("Trailers to which production equipment is attached").

{¶ 23} The amended statute also provides a non-exhaustive list of tangible personal property and other items that do not qualify as a "thing transferred" for purposes of the exemption. R.C. 5739.02(B)(42)(q)(ii). Some of these provisions are potentially applicable to the equipment at issue here.

{¶ 24} As previously described, the process of extracting crude oil and natural gas by hydraulic fracturing appears to be complex. The precise function and use of each piece of equipment at issue here must be assessed based on the definition of "production" as well as the lists of items qualifying or not qualifying as a "thing transferred" to determine if the tax exemption applies.

{¶ 25} The BTA had no opportunity to assess the equipment at issue using the clarified standard provided in R.C. 5739.02(B)(42)(q). We decline to address whether the contested equipment is exempt from sales tax under R.C. 5739.02(B)(42)(q) for the first time on appeal. The BTA should first make such determinations on remand. Thereafter, if necessary, this court will determine the reasonableness and lawfulness of such decision. Therefore, we remand the matter to the BTA for further proceedings. *See Salem v. Koncelik*, 164 Ohio App.3d 597, 2005-Ohio-5537, ¶ 20 (10th Dist.) (This court declined to address the consideration of Ohio Adm.Code 3745-1-07(A)(6)(b) for the first time on appeal and remanded to the Environmental Review Appeals Commission to determine whether the director's action was unreasonable or unlawful and whether the requirements of Ohio Adm.Code 3745-1-07(A)(6)(b) had been met.). For this reason, we sustain Stingray's first assignment of error.

### 2. Second Assignment of Error

{¶ 26} Stingray argues that the penalty should have been eliminated for the 33 pieces of equipment that qualified for exemption from Ohio's sales tax based on the tax commissioner's reassessment.

{¶ 27} The BTA found that Stingray had failed to meet its burden with regard to the abatement of the assessed penalties, having presented "no further argument in support." (BTA Decision at 3.) The BTA noted that remission of the penalty is discretionary, and that appellate review "is limited to a determination of whether an abuse has occurred." *Id.*, *Jennings & Churella Constr. Co. v. Lindley*, 10 Ohio St.3d 67, 70 (1984). The BTA held that determining whether an abuse occurred, "the result must be palpably and grossly violative of fact and logic." (Quotation and citations omitted.) *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985). The BTA concluded that there is no evidence that the tax commissioner abused his discretion with regard to the amount of penalties assessed.

{¶ 28} With respect to the items that were ultimately determined to be exempt from taxation, we respectfully disagree. It is illogical and grossly unfair to assess penalties for nonpayment of taxes on items that were determined to be exempt from tax. Accordingly, Stingray's second assignment of error is sustained.

No. 18AP-110 and 18AP-111

## IV.   CONCLUSION

{¶ 29} Based on the foregoing, we sustain Stingray's two assignments of error, reverse the decision and order of the Ohio Board of Tax Appeals and remand this matter to the Ohio Board of Tax Appeals to re-assess the equipment at issue according to R.C. 5739.02(B)(42)(q) and this decision.

*Judgment reversed; case remanded.*

LUPER SCHUSTER, and BRUNNER, JJ., concur.

---